[Civ. No. 29125.   Second Dist., Div. Four.   Feb. 20, 1967.]

CECIL R. MILLER et al., Plaintiffs, Cross-defendants and Appellants, v. CITIZENS SAVINGS & LOAN ASSOCIATION et al., Defendants and Respondents; WEST-GLEN CORP., Defendant, Cross-complainant and Respondent.

Leighton G. Long and William T. Selby for Plaintiffs, Cross-defendants and Appellants.

Price, Postel & Parma, H. Clarke Gaines, Everett H. Aspenson, Frank X. Ball, Arthur G. Bowman, John R. Engman, and Keith Holaday for Defendants and Respondents.

Heily & Blase and Neil D. Heily for Defendant, Cross-complainant and Respondent.

KINGSLEY, J.—The complaint in the case herein charges three causes of action, one in declaratory relief, the second on foreclosure, and the third on the theory of waste. Defendants filed demurrers which were overruled as to the first and second causes of action, and sustained as to the third cause of action.

Defendant Westglen Corp., cross-claimed. A motion for judgment on the pleadings was granted to defendants Harry E. Mahood, Richard M. Guetzow and Westglen Limited. Plaintiffs introduced oral and documentary evidence. The motions of defendants Westglen Corp. (hereinafter called Westglen), and Citizens Savings & Loan Association (hereinafter called Citizens) and Title Insurance & Trust Company for judgment pursuant to Code of Civil Procedure section 631.8 were granted. The court granted judgment to plaintiffs on the cross-complaint; it entered a single judgment in favor of all defendants on the complaint. From that judgment, plaintiffs appealed. Harry E. Mahood, originally a defendant, died without leaving an estate and representative before filing of the notice of the appeal, and no substitution has been made.

On March 19, 1962, plaintiffs sold real property, consisting of 18 lots, to Westglen for $100,000. Westglen paid $5,000 down and gave a promissory note payable to plaintiffs in the amount of $95,000. This note was secured by a first deed of trust on the land, executed by defendant Westglen to defendant Title Insurance & Trust Company as trustee for the benefit of plaintiffs. This first deed contained a subordination clause which read in part as follows: "This deed of trust, . . . is hereby made subject and subordinate to one or more deeds of trust to be hereafter executed by the trustors, . . . made primarily for the purpose of constructing improvements on the lot or lots described therein, the proceeds of any such loan, however, may be disbursed for, or portions thereof may be applied in, payment of costs including but not limited to, any one or more or all of the following: off-site improve-

ments on the land described in such deed of trust or on the land described in such deed of trust and other land, on-site improvements, escrow charges, premiums for hazard insurance, title insurance premiums, loan costs including discounts, interest, commissions, overhead charges and costs, advertising expenses of sales, and other costs incurred in connection with such contemplated improvements, with any remainder of any such loan, after all payments have been made, to the borrower thereof, each such loan to be evidenced by a promissory note or notes bearing interest at not more than 7.2 percent per annum, plus any late charges and/or penalties, and payable at such times and upon such terms as are required by the lender thereof. From and after the recordation of any such deed of trust to which this deed of trust is hereby made subject and subordinate as above provided, such hereafter executed deed of trust shall at all times, prior to the reconveyance thereof, constitute a lien or charge on the land therein described prior and superior to the lien or charge of this deed of trust as to any and all loans or advances which shall be made under such hereafter executed deed or deeds of trust according to the terms and provisions of each such deed of trust and the promissory note secured thereby and without regard to the application or use of the proceeds of any or all such loans or advances insofar as the validity of this subordination is concerned.''

Immediately after this transaction, Westglen arranged to borrow a total of $349,500 from Citizens, evidenced by 18 separate promissory notes, each note secured by a separate deed of trust on one of the 18 lots. On March 23, 1962, plaintiffs, at the request of Westglen, executed 18 separate subordination agreements, one with reference to each of the 18 trust deeds. Except for dates and figures, these agreements were couched in similar terms, a typical agreement providing that the trust deed in favor of plaintiffs ''shall be subject and subordinate to a new Trust Deed to be executed by Westglen Corp. to the Title Insurance and Trust Co., as Trustee, and Citizens Savings and Loan Association, as Beneficiary, to secure a Note dated March 21, 1962, in the amount of $18,950.00 with interest at the rate of 6½ percent per annum, payable $129.00 per month, beginning December 1, 1962, and continuing until said principal and interest have been paid in full. Said new Deed of Trust to be recorded concurrent herewith covering the following described premises.'' Plaintiffs and the notary were the only parties to sign these documents.

These 18 agreements and the 18 trust deeds were duly recorded.

Some time after securing the loans from Citizens, Westglen constructed 18 houses on the property—one house on each of the 18 lots. Citizens paid out, for various purposes within the purposes set forth in the subordination clause of the deed of trust held by plaintiffs, all of the proceeds of the 18 loans except $26,341.30;[1] this latter amount was paid by Citizens to Westglen and has been retained by Westglen for its own purposes.

The houses and lots proved unsaleable; Westglen defaulted and tendered the property back to plaintiffs.

It is plaintiffs' contention that the proceeds of the Citizens' loan could be used only for the specific purposes set forth in the subordination agreement contained in their trust deed and, therefore (a) that Citizens was guilty of an actionable wrong in paying the $26,341.30 to Westglen, and (b) that Westglen is under a duty to pay that sum to plaintiffs, either as money improperly received, or as money received for payment to plaintiffs on the $95,000 note. Westglen, on the other hand, contends that it was entitled to keep the $26,341.30 and that its only duty is to return the property to plaintiffs, encumbered by the Citizens' loan and the 18 trust deeds which secure it, without personal obligation since the $95,000 note and plaintiffs' trust deed were "purchase money" obligations within the provisions of section 580b of the Code of Civil Procedure.

The effect of the judgment herein appealed from was to adopt the position of Westglen. We disagree. We conclude, on the record so far made in this litigation,[2] that, as a result of

---

[1]The pleadings, record and briefs use varying figures. We can find nothing to support the contention that payments made by Citizens were for purposes not allowable under the subordination agreement, except for the final payment of $26,341.30 made directly to Westglen. However, on remand, the parties will be free to re-examine the total disbursements against the terms of the original subordination agreement.

Unlike the subordination clause before the court in *Collins* v. *Home Savings & Loan Assn.* (1962) 205 Cal.App.2d 86 [22 Cal.Rptr. 817], the language herein involved, as quoted above, was broad enough to permit the payment of loan fees and expenses (the "points"), as well as the "finder's fee" and the interest payments to Citizens and to plaintiffs. On this point, consult Miller, Starr and Regalia, *Subordination Agreements in California* (1966) 13 U.C.L.A. L.Rev. 1298, 1309, footnote 41.

[2]The judgment herein was entered as the result of the trial court's action on a motion made under section 631.8 of the Code of Civil Procedure. Since we conclude that that motion should have been denied rather than granted, it follows that, under the terms of that section, defendants

the transactions herein involved: (a) Citizens held valid first deeds of trust to secure an obligation to it by Westglen totaling $323,158.70, less any payments that may have been made on the promissory notes secured by such trust deeds; (b) that plaintiffs held a valid second deed of trust to secure an obligation to them by Westglen of $95,000, less any payments that may have been made on the promissory note which their deed of trust secures; (c) that Citizens held a valid third deed of trust to secure an obligation to it by Westglen of $26,341.30, less any payments that may have been made on such obligations; (d) that neither Westglen nor Citizens are liable to plaintiffs in money damages; and (e) that the trial court properly dismissed the cause of action for waste.

I

■ Defendants contend that, since the trial court received extrinsic evidence as an aid to the interpretation of the documents herein involved, this court is bound by that court's interpretation, citing *Estate of Rule* (1944) 25 Cal.2d 1, 11 [152 P.2d 1003, 155 A.L.R. 1319], *Collins* v. *Home Savings & Loan Assn.* (1962) 205 Cal.App.2d 86, 101 [22 Cal.Rptr. 817], and *Overton* v. *Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757]. But that is no longer the rule in this state. In *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839], the Supreme Court said: "We disapprove language in *Estate of Rule*, 25 Cal.2d 1, 11 [152 P.2d 1003, 155 A.L.R. 1319], to the effect that an appellate court must accept a trial court's interpretation of a written instrument when 'conflicting inferences may be drawn' from extrinsic evidence. The rule of *Estate of Platt*, 21 Cal.2d 343, 352 [131 P.2d 825], and the cases applying it make it clear that it is only when conflicting inferences arise from conflicting evidence, not from uncontroverted evidence, that the trial court's resolution is binding. 'The very possibility of . . . conflicting inferences, actually conflicting interpretations, far from relieving the appellate court of the responsibility of interpretation, signalizes the necessity of its assuming that responsibility.' (*Estate of Rule, supra,* 25 Cal.2d at p. 17 [dissenting opinion].)'' In the case at bench there was no conflict in the extrinsic evidence submitted to aid in the interpretations of the instruments. Therefore, it is both

are entitled to proceed with any defensive evidence which they may have. Nothing in this opinion is intended to foreclose a different result if the evidence at a new trial presents a different picture from that which appears from the record before us.

the right and the duty of this court to reinterpret those instruments.

## II

It was the view of the trial court that the 18 subordination agreements executed by plaintiffs were separate transactions, unconnected with the subordination agreement contained in plaintiffs' trust deed and that, since those 18 agreements did not specifically restrict the uses to which the loan proceeds could be put, Citizens and Westglen were free to use them as they saw fit. We disagree. We think it clear that these documents must be read together with the original subordination agreement, as parts of a single agreement. In *Collins* v. *Home Savings & Loan Assn., supra* (1962) 205 Cal.App.2d 86, 98, the court said: ''This aspect of the case is important because it is a general rule that 'Where two or more written instruments are executed contemporaneously, with reference to each other, for the purpose of attaining a preconceived object, they must all be construed tgether, and effect given if possible to the purpose intended to be accomplished.' [Citation.] This principle controls whether each of the several instruments was signed by all or only some of the parties to the transaction. [Citation.]—Thus, the transaction may be tripartite or even more complex, a factor that must not be disregarded in the process of interpretation of any of the documents. [Citation.] ''

The 18 separate subordination agreements in the instant case were executed only four days after the first subordination agreement; as was the case in *Collins,* they were (so far as this record discloses) made without additional consideration to plaintiffs; they were also executed for the same basic purpose as the first agreement, that is to obtain loans for the improvement of the land. The various agreements are not necessarily inconsistent. The extrinsic evidence in the record before us sheds no light on whether or not plaintiffs were asked to, or agreed to, or were expected to, effect a novation and to substitute the new 18 separate subordination agreements for the provision contained in the original trust deed. Lacking any evidence to show that such a novation was, in fact, intended and accomplished, we hold that, looking at the several instruments by themselves and construing them according to their face, they should be regarded as being a single transaction and that the latter 18 documents should be treated

as designed only to make the original provision specific and to implement it.[3]

It will be noted that the original subordination agreement was lacking in several important details, the chief of which was the failure to specify either the amount of the loans to be procured, or their terms. The transaction took place in 1962, long prior to our holding in *Stockwell* v. *Lindeman* (1964) 229 Cal.App.2d 750 [40 Cal.Rptr. 555], which approved subordination agreements which left many of the terms of the new loans to negotiation between the purchaser-borrower and his financial source. The agreement here was even less specific than that there approved, since it did not, as did the agreement in *Stockwell*, limit the amount of the loan or the interest rate. (*Handy* v. *Gordon* (1967) 65 Cal.2d 578 [55 Cal.Rptr. 769, 422 P.2d 329].) The 18 subsequent agreements, thus, served the purpose of making specific what the original agreement had omitted and, by approving specific loans and trust deeds, removed any possibility that plaintiffs might thereafter contend that the whole subordination arrangement was void and unenforceable.

Since the separate agreements thus served an understandable function consistent with the continued effectiveness of the original provision, we think that it is incumbent on the lender or the buyer to show, by competent evidence, that they were intended to do more and to strip the seller of the protection for which he had originally bargained. As we have said above, since the case never went to the stage of the introduction of defensive testimony, and since the extrinsic evidence produced sheds no light on the negotiations, if any, which preceded the execution of the 18 separate agreements, there is nothing before us to show that a novation was either intended or accomplished.

### III

It is clear that the original subordination agreement was restrictive in nature. Subordination arrangements are in the nature of a mutual enterprise, wherein the vendor provides the land, the purchaser the ''know how'' and the purchaser's

[3] ''However, even under the 'automatic' subordination agreement, a title company will usually require the seller to execute another document at the time the new lien is recorded, in order specifically to subordinate the seller's lien to the new lien.'' (Miller, Starr and Regalia, *Subordination Agreements in California* (1966) 13 U.C.L.A. L.Rev. 1298, 1300.)

It is to be noted that the 18 separate agreements herein involved do not contain the protective language in favor of the lender which the authors of the cited article suggest in the footnote to the passage here quoted.

lending agency the capital, for the mutually beneficial purpose of developing the land and disposing of it (usually by sale; occasionally by rental), to provide a fund out of which the vendor is paid for his land, the lender is repaid its loan with interest, and the purchaser receives compensation for his efforts and skill.[4] ■ Because of their nature, ''The law is well settled that rights of priority under an agreement of subordination extend to and are limited strictly by the express terms and conditions of the agreement. [Citations.]'' (*Irvine v. California Cotton Credit Corp.* (1937) 18 Cal.App.2d 761, 763 [64 P.2d 782].) While it may not be impossible that a vendor has agreed to subordinate his purchase money lien to a lien secured by the purchaser to be used for purposes entirely apart from the mutual enterprise, such an arrangement would be so unusual and so unlikely that we would require it to be spelled out with particularity. ■ Typically the loan proceeds are to be used for purposes which will promote the mutual enterprise and which will either enhance the vendor's equity in case he must foreclose his lien, or will provide funds from which he will be paid. A subordination agreement should be construed, unless it expressly provides otherwise, as permitting the loan proceeds to be used only for such purposes.[5]

■ Reading the agreement before us, unexplained as it is

---

[4] ''In effect, the seller is assisting in the financing of the buyer's development and becoming a quasi 'joint venturer' in the project. The safety of his 'investment' depends upon the success of the development, for as soon as the new lien is imposed on the property to secure the construction loan, the property is over-encumbered. If, for example, a parcel of property is sold for $100,000, the seller takes a $50,000 secured note for part of the purchase price, and then a $500,000 construction loan is secured by a lien elevated to first priority through a subordination agreement, the total liens exceed the value of the property until the improvements are completed.'' (Miller, Starr and Regalia, *Subordination Agreements in California* (1966) 13 U.C.L.A. L.Rev. 1298, 1299.)

[5] Consult, for an analysis of the problem, Miller, Starr and Regalia, *Subordination Agreements in California* (1966) 13 U.C.L.A. L.Rev. 1298, at pp. 1306-1309.

In *Gill* v. *Mission Sav. & Loan Assn.* (1965) 236 Cal.App.2d 753 [46 Cal.Rptr. 456], the complaint was not that the lending agency had knowingly made payments for a purpose outside the terms of the subordination agreement, but that it had acted negligently in not seeing that the funds were wisely expended. The plaintiffs here make no claim that the lender acted negligently in permitting any of the disbursements purportedly for purposes within the subordination agreement and the question of a lender's liability for negligence is not before us. Furthermore, in *Gill*, no issue was raised as to the priority of the first trust deed as to moneys not expended for improvements.

In *Matthews* v. *Hinton* (1965) 234 Cal.App.2d 736 [44 Cal.Rptr. 692], the court concluded that the transaction with the lender therein involved produced a new agreement which eliminated any restrictions on the use

by any other evidence, in the light of the principles hereinabove set forth, we think it may not be construed as an agreement by plaintiffs to subordinate their purchase money trust deed to any loan except one whose proceeds were to be used for one or more of the purposes expressly set forth in the subordination clause of their trust deed, quoted above. True, the subordination agreement here provided for a loan much broader than the usual "construction" loan. The parties contemplated that, out of the proceeds of the new loan, Westglen was to plan, develop, and sell a small subdivision, with all of the expenses of promotion which such a project involves. Plaintiffs agreed that, within the outside limit of the total loans which they ultimately approved, Westglen could use its discretion in incurring one or more of the kinds of expense set out in the original trust deed and Citizens was assured of priority for moneys advanced by it for any of such purposes. But all of the purposes spelled out at length in the agreement were purposes which could be expected to inure to the benefit of plaintiffs as well as Westglen, since they were part of an enterprise out of which the money to pay off plaintiffs' $95,000 note was to come.

Westglen points to the language in the agreement that permitted payment of "any remainder of any such loan, after all payments have been made, to the borrower thereof." But this language relates to the manner in which the loan proceeds were to be disbursed, not to the purposes to which they were to be applied. In any transaction such as this there will be expenses, legitimately chargeable to the development project, which will not be the subject of vouchers submitted to the lending agency. That system is designed chiefly to insure the lender that no costs which might be the subject of a lien will remain unpaid; other expenses will often be paid directly by the borrower[6] and the language quoted is intended to permit the lender to reimburse the borrower for such out-of-pocket payments. But it does not bring within the priority of the loan any payments which are not permitted by the "purpose" clauses of the agreement.

Since Citizens was aware of the limitations of the subordi-

---

of the loan proceeds. The subordination provision therein involved and the relationships between the parties (lessors, lessee and a lender) were so different from those disclosed by this record that the case is not here in point.

[6]We note, by way of example, that among the permitted purposes, were "overhead charges and costs, advertising expenses of sales"—all items which would rarely, if ever, be paid against vouchers by checks of the lending agency drawn in favor of third parties.

nation arrangement, it follows that it cannot claim a priority for any moneys advanced for purposes outside those permitted. However, Westglen as owner, and Citizens as a lending institution, were, of course, so far as plaintiffs were concerned, entirely free to negotiate any loan they desired, so long as it did not affect the priority of plaintiffs' trust deed. It follows that the payment by Citizens to Westglen of the disputed $26,341.30, was not illegal, but merely that it was a loan not within the subordination agreement and, therefore, subject to and not prior to, plaintiffs' trust deed and the $95,000 obligation which that trust deed secured.

IV

Plaintiffs' third cause of action was based on the theory of waste. Relying on section 2929 of the Civil Code, which section provides: "No person whose interest is subject to the lien of a mortgage may do any act which will substantially impair the mortgage security," they argue that, while their security would not have been impaired if the entire loan proceeds had been used as provided in the subordination agreement (since the total value of the property would have been enhanced *pro tanto*), it was reduced when the land became subject to a loan whose proceeds were not used to enhance the value of the property.

The theory is ingenious but we do not think it applicable in this case if it could ever be valid.[7] As we have pointed out above, the property is encumbered to plaintiffs' detriment only to the extent that the proceeds were used for purposes agreed to by plaintiffs; the additional encumbrance, being subordinate to plaintiffs' lien, obviously does not impair *their* security. No "waste," even in the sense used by plaintiffs, occurred.

Insofar as the judgment dismisses the third cause of action, it is affirmed; otherwise the judgment is reversed for further proceedings consistent with this opinion. Appellants shall recover costs in this court.

Files, P. J., and Jefferson, J., concurred.

---

[7]We are cited to no cases, and we have found none, wherein the concept of "waste" was applied to anything other than acts of commission or omission which caused physical damage to the real property. (Consult: *Easton* v. *Ash* (1941) 18 Cal.2d 530 [116 P.2d 433]; *Southern Pacific Land Co.* v. *Kiggins* (1930) 110 Cal.App. 56 [293 P. 708].)