[Civ. No. 845.   Fifth Dist.   June 14, 1968.]

SILAS RAMBO et al., Plaintiffs and Appellants, v. ALBERT F. BLAIN et al., Defendants and Respondents.

Barrett, Wagner & Dietrich and Richard W. Dietrich for Plaintiffs and Appellants.

Houk, Monson & Houk, Gareth W. Houk, Jr., Russell R. McKinney and Frederick A. Jacobus for Defendants and Respondents.

GARGANO, J. — Plaintiffs Silas Rambo and Sylvia J. Rambo (husband and wife) brought this action in the Superior Court of Tulare County for rescission of an assignment of a deed of trust, for declaration of a constructive trust on real property and for damages for fraud and conspiracy. However, after discovery proceedings were completed all defendants moved for a summary judgment, and their motion was granted by the trial court. Plaintiffs appeal from the resulting judgment.

The facts, as gathered from the depositions and declarations, after giving plaintiffs the benefit of all doubts and resolving all conflicts in their favor, are essentially as follows.

Plaintiffs owned 36½ acres of land on Mooney Boulevard in Visalia, California. On August 23, 1963, plaintiffs sold their land to a land developer, T. J. Davis, for the purchase price of $100,000. Briefly, the terms of the sale were $10,000 down; the $90,000 balance, as evidenced by a promissory note secured by a deed of trust, to be paid on a lot release basis as soon as the land was subdivided; the subdivision development costs to be financed through defendant Guarantee Savings and Loan Association; the plaintiffs to subordinate their trust deed to a first trust deed in favor of the Guarantee Savings and Loan Association to secure the development loan up to $100,000. Hereafter the land shall be referred to as the Rambo land, the trust deed in favor of Guarantee Savings and Loan Association shall be referred to as the first trust deed, and plaintiffs' trust deed shall be referred to as the second trust deed.

Before selling his land to Davis, Silas Rambo first consulted

several friends about Davis' reputation; he was told that Davis was a successful and reliable builder. Rambo then consulted defendant Walker B. Robinett, the president and general manager of defendant Guarantee Savings and Loan Association. Robinett told Rambo that his institution would "go with him (Davis) all the way" and that Davis was "the only man I (Robinett) would finance." Rambo also asked Robinett how he (Rambo) could be sure that the subdivision development costs would be accurate and not padded; Robinett told Rambo that the Guarantee Savings and Loan Association would make payments to Davis on a voucher basis and verify that the work had been done, thus protecting Rambo.

In May 1964, after the subdivision development work had been partly completed, Davis filed Chapter XI arrangement proceedings. Subsequently, Robinett and Davis told Rambo that the subdivision development work would proceed as planned and Rambo would be paid in full. But in May 1965 Robinett and Davis suggested to Rambo that Rambo take back the land subject to the lien created by the development loan, which by then amounted to $65,943.56. Rambo refused because he had not been furnished with an itemized statement of the work performed and because the water system for the subdivision was not included in the deal.

A few days later Davis told Rambo that he was going to sell the subdivision lots to builders and that Guarantee Savings and Loan Association was going to finance the construction of homes on the lots. Afterwards Robinett confirmed this plan and told Rambo it would mean that Rambo would be paid in full. This assurance was repeated several times during the summer of 1965, but nothing ever came of it.[1]

During the period between May and September 1965 Robinett told Rambo several times that if Davis did not make progress on the subdivision development work the Guarantee Savings and Loan Association would take over the subdivision and complete it. However, when Rambo visited Robinett in the latter part of September to ascertain what had been done he was offered $50,000 for his second trust deed. Rambo rejected the offer. At this meeting Robinett admitted that "everybody could be paid off in full if they went ahead with the subdivision."

---

[1]The only payment that Rambo received from Davis in addition to the down payment of $10,000 was the sum of $3,000 on the sale of three lots. Before Davis filed Chapter XI arrangement proceedings he built three model homes on the Rambo property. In June of 1965 Rambo was paid $1,000 a lot under the release clause when the three lots upon which the model homes were located were sold.

In early October, shortly after Rambo rejected Robinett's offer, Rambo was informed that the Guarantee Savings and Loan Association had sold its first trust deed to the defendant Albert F. Blain. Blain was one of the original organizers of the Guarantee Savings and Loan Association. In 1958 Blain sold his stock in the company to John Sullivan under a trust arrangement in which Robinett was one of the trustees. Mr. Sullivan is also the president of the Sequoia Savings and Loan Association of Fresno.

When Rambo learned that defendant Guarantee Savings and Loan Association had sold its first trust deed to Blain, he offered to sell his second trust deed to Blain at a discount of 10 percent. This offer was rejected by Blain. Instead Blain offered Rambo $50,000 for the second trust deed and then, using vile and abusive language, threatened to wipe Rambo out (by a foreclosure of the first trust deed) if Rambo did not accept this offer. The following week, after Blain made similar threats, Rambo, in fear of being wiped out, sold his trust deed to Blain.

Later Rambo discovered that when Blain threatened to foreclose his first trust deed and wipe him out Blain had already purchased the Rambo property from Davis; the Rambo property was sold by Davis on October 13, 1965, to the Sherwood Property Company, a California corporation owned entirely by Blain. Rambo also discovered that the Guarantee Savings and Loan Association had loaned Blain $50,000 to buy Rambo's second trust deed and that subsequently the parties had successfully negotiated a new loan of $175,000 from the Sequoia Savings and Loan Association of Fresno. This loan was negotiated largely through the cooperation of John Sullivan and a part of the proceeds were used to pay the Guarantee Savings and Loan Association in full. A payment of $15,000 was also made to defendant Davis.[2]

---

[2] In view of the complexity of the transactions which resulted in the $175,000 loan from Sequoia Savings and Loan Association to Blain, with the Rambo property as security, we have deemed it advisable to describe these transactions in detail.

The Rambo property was apparently sold by Davis to the Sherwood Property Company, Blain's corporation, on October 13, 1965; in any event, on that date a grant deed, without revenue stamps, from Mr. and Mrs. Davis to Sherwood Property Company, a California corporation, was recorded.

On October 26, 1965, the assignment of the second trust deed by the Rambos to Blain was recorded. At the same time an assignment of this trust deed by Mr. and Mrs. Blain to the Guarantee Savings and Loan Association was also recorded. In other words, on October 26, 1965, the

█ It is well established law that a summary judgment is drastic in nature and should be resorted to sparingly and with great caution so that it does not become a substitute for the open trial method of determining facts (*Eagle Oil & Refining Co.* v. *Prentice,* 19 Cal.2d 553, 556 [122 P.2d 264]; *Coyne* v. *Kremples,* 36 Cal.2d 257, 260 [223 P.2d 244]; *Albermont Petroleum, Ltd.* v. *Cunningham,* 186 Cal.App.2d 84, 91-92 [9 Cal.Rptr. 405]). █ Thus, it has been repeatedly stated that a motion for summary judgment is not a trial upon the merits, and "[i]f an issue of fact is raised, then a summary judgment is improper, and the case must proceed to trial." (*Bank of America* v. *Casady,* 15 Cal.App.2d 163, 168 [59 P.2d 444].) █ And, significantly, this court has said on at least two occasions: " 'If, after an examination of the affidavits, doubt exists as to whether summary judgment

---

Rambos apparently assigned their second trust deed to the Blains who in turn assigned this trust deed to the Guarantee Savings and Loan Association. The Guarantee Savings and Loan Association then loaned Blain $50,000 and this money was used to pay the Rambos for the assignment of their trust deed. Also, on this same date, the Guarantee Savings and Loan Association assigned its first trust deed to the Blains, but this assignment was not recorded on that date.

Later, through the intervention of John Sullivan, the First National Bank of Fresno loaned $139,000 to the Visalia Building Company, Inc., a corporation also owned by Blain. This loan was consummated as follows: On November 18, 1965, the assignment of the first trust deed by Guarantee Savings and Loan Association to Blain, which was executed on October 26, 1965, was recorded. Blain then assigned this first trust deed to the Visalia Building Company, which in turn assigned it to the First National Bank of Fresno. At the same time an assignment of the second trust deed from Guarantee Savings and Loan Association to the Visalia Building Company was recorded. The Visalia Building Company in turn assigned the second trust deed to the First National Bank of Fresno. Thus, by virtue of these multiple assignments, the First National Bank of Fresno received assignments of both the first and second trust deeds against the Rambo property as security for its loan of $139,000 to the Visalia Building Company, Inc.

The proceeds of this loan were distributed as follows: $110,000 was paid to Guarantee Savings and Loan Associatioan to discharge loans made to Albert E. Blain when he acquired the first and second trust deeds; $24,000 was paid to Visalia Building Company, Inc. and the balance was used for loan fees, taxes and escrow expenses.

On December 14, 1965, the Sequoia Savings and Loan Association, true to the promise made earlier by John Sullivan, loaned $175,000 to Albert F. Blain's corporation, the Sherwood Property Company. $139,000 of this money was paid to the First National Bank of Fresno in repayment of its loan. The sum of $15,000 was credited to the account of defendant Davis. The remaining funds were paid to the Sherwood Property Company. The First National Bank of Fresno then reassigned the first and second trust deeds to the Visalia Building Company, and full reconveyances were recorded. The Sequoia Savings and Loan Association then received a first trust deed against the Rambo property as security for its loan.

should be granted, such doubt should be resolved against the moving party'." (*Johnson* v. *Banducci,* 212 Cal.App.2d 254, 261 [27 Cal.Rptr. 764]; *Silver Land & Dev. Co.* v. *California Land Title Co.,* 248 Cal.App.2d 241, 242 [56 Cal.Rptr. 178].)

Applying these principles to the instant case, we are impelled to conclude that plaintiffs' evidence has raised a genuine doubt as to the propriety of the summary judgment, and hence the judgment must be reversed. In other words, when the string of broken promises and assurances made by defendant Davis and defendant Robinett to plaintiff Silas Rambo are viewed in light of the other circumstantial evidence, there is sufficient believable evidence to raise an inference that all defendants were involved (to some extent or another) in a fraudulent conspiracy to deprive the plaintiffs of their property. It is the rule that a promise made with intent to deceive or induce a person to enter into a contract without any intention of performing it, is actual fraud (Civ. Code, § 1572 subd. 4). And it has been repeatedly stated that *"without the consideration of other evidence,* the subsequent failure to perform [a promise] warrants the inference that [the promisor] did not intend to perform when [he] promised"* (italics added) (*Wilson* v. *Rigali & Veselich,* 138 Cal.App. 760, 765 [33 P.2d 455]; *Boyd* v. *Bevilacqua,* 247 Cal.App.2d 272, 292 [55 Cal.Rptr. 610]; *Wilkenson* v. *Linnecke,* 251 Cal.App.2d 291, 293 [59 Cal.Rptr. 290]).

First, Robinett told Rambo at the very outset of their business relationship that his institution would "go with him (Davis) all the way" and that Davis was "the only man I (Robinett) would finance." Later, after Davis had gone into Chapter XI proceedings, both Robinett and Davis repeatedly assured Rambo that the subdivision development work on the Rambo land would be completed and that Rambo would be paid in full. And still later, when Rambo refused to purchase the first trust deed he was told that Davis was going to sell subdivision lots to builders who were going to build homes on the lots with financing from the Guarantee Savings and Loan Association. In fact, Rambo was assured that this plan which never matured to fruition would insure his payment in full.

Second, during the period between May 1965 to September 1965, Robinett told Rambo several times that if Davis did not make progress on the subdivision development work the Guarantee Savings and Loan Association would take over the subdivision and complete it. Yet, in late September Robinett suddenly offered to purchase the second trust deed for only

$50,000. And, significantly, Robinett made this offer while admitting that "everybody could be paid off in full if they went ahead with the subdivision."

Third, after Rambo rejected Robinett's offer to purchase the second trust deed for $50,000, the Guarantee Savings and Loan Association apparently reneged on its numerous assurances that if Davis did not make progress on the subdivision development work the Guarantee Savings and Loan Association would take over the subdivision and complete it; without even notifying the Rambos of its intention to do so, it sold its first trust deed to defendant Blain. Then to make matters worse Blain offered to purchase Rambo's trust deed for $50,000 with money supplied by the Guarantee Savings and Loan Association and then threatened to wipe Rambo out if Rambo did not accept this offer.

Finally, to complete the circle of highly suspect conduct, Blain, using the Rambo land as security, negotiated a loan of $175,000 from the Sequoia Savings and Loan Association of Fresno and then not only paid Guarantee Savings and Loan Association in full but also made a $15,000 payment to defendant Davis.

Admittedly, plaintiffs' evidence, even when taken at face value, is highly circumstantial and does not have the convincing quality desirable for the successful prosecution of fraud cases. Thus, defendants rely on our opinion in *Pettus* v. *Standard Cabinet Works*, 249 Cal.App.2d 64 [57 Cal.Rptr. 207], wherein we indicated that a summary judgment is properly granted when a plaintiff's evidence, as disclosed by his own affidavits, fails to meet the quantum of proof required to establish liability. In that case we stated: "To compel a defendant in a personal injury action to go to trial with admittedly this quantum of evidence against him would not only subject the defendant to the wildest speculation by a jury, but it would distort the basic principle which requires a plaintiff to establish liability by a preponderance of the evidence." (249 Cal.App.2d 64, 69.)

Significantly, in *Pettus* we were concerned with a hit and run accident. There were no eyewitnesses to the accident. Plaintiffs' only evidence was that a license plate which had fallen from one of the defendant's trucks was found near the scene of the accident. However, defendant's truck had been inspected by an officer of the Highway Patrol shortly after the accident, and it showed no signs of having been in an accident. We held that plaintiffs' evidence merely created a

suspicious circumstance but was not sufficient to withstand a motion for a nonsuit.

In the instant case we do not have merely a highly suspicious circumstance. On the contrary, we also have numerous broken promises and assurances (which alone create an inference of fraud), buttressed by the apparent breach of the quasi-fiduciary duty arising out of a relationship which was at least tantamount to a mutual enterprise requiring all parties to deal with each other openly and aboveboard. As the court stated in *Miller* v. *Citizens Sav. & Loan Assn.*, 248 Cal.App.2d 655, 662-663 [56 Cal.Rptr. 844]: ''Subordination arrangements are in the nature of a mutual enterprise, wherein the vendor provides the land, the purchaser the 'know how' and the purchaser's lending agency the capital, for the mutually beneficial purpose of developing the land and disposing of it (usually by sale; occasionally by rental), to provide a fund out of which the vendor is paid for his land, the lender is repaid its loan with interest, and the purchaser receives compensation for his efforts and skill.''

Lest we create the impression that we believe the defendants guilty of fraud, we deem it appropriate to point out that they have emphatically denied many of Rambo's assertions and have offered reasonable and acceptable explanations as to the others. However, as we stated at the outset, we are not here concerned with the weight or credibility of the evidence. We are merely concerned with the question whether plaintiffs' evidence establishes triable material issues of fact. We conclude that it does.

The judgment is reversed.

Conley, P. J., and Stone, J., concurred.

The petitions for a rehearing were denied July 12, 1968, and the opinion was modified to read as printed above.