[No. C025634. Third Dist. Jan. 27, 1998.]

THOMAS P. FRIERY et al., Cross-complainants and Appellants, v. SUTTER BUTTES SAVINGS BANK, Cross-defendant and Respondent.

## Counsel

Dillon & Rodgers, Robert W. Dillon and Gary M. Gelfman for Cross-complainants and Appellants.

Mark A. Doughty, McDonough, Holland & Allen, Daniel V. Martinez and Ann Taylor Schwing for Cross-defendant and Respondent.

## Opinion

**CALLAHAN, J.**—Thomas P. and Linda Friery (Friery),[1] junior lienholders on certain real property in Sutter County, appeal from a summary judgment granted in favor of the senior lienholder Sutter Buttes Savings Bank (Sutter Buttes or the bank) on her cross-complaint. In granting the bank's motion for summary judgment, the trial court rejected Friery's claim that Sutter Buttes so impaired her security by modifying the terms of its senior promissory note such that the Friery lien should be judicially elevated to a superior position in priority.

Friery's theory of relief is premised on the case of *Gluskin* v. *Atlantic Savings & Loan Assn.* (1973) 32 Cal.App.3d 307 [108 Cal.Rptr. 318], which created a duty on the part of senior lenders toward subordinating sellers not to substantially impair their security without the latter's consent.

We decline to extend *Gluskin* to the situation presented here, which involves a garden variety junior lienholder who has not subordinated, bears no special relationship to the senior and possesses no extraordinary facts in her favor which would warrant the imposition of such a duty. We therefore affirm the judgment.

### Background

The commercial property which is the subject of this suit is located on Center Street in Yuba City. The Center Street property consists of an office building, a parking lot, and a vacant lot. In 1986, Dennis and Debra Ferraiuolo executed a promissory note in the principal amount of $408,100

---

[1]Although both Thomas and Linda Friery are cross-complainants, the record reflects that Linda, a real estate broker with 14 years of experience, was the active participant in the events which give rise to this lawsuit. For that reason, we shall henceforth refer to Linda Friery in the singular as a shorthand method of denominating both cross-complainants.

in favor of Sutter Buttes[2] secured by a first deed of trust on the property. The deed of trust was recorded April 11, 1986.

Ferraiuolo subsequently conveyed the Center Street property to one Porter, who encumbered the property with three additional deeds of trust securing promissory notes from Jarvis, Marysville Lakeville Apartments, Ltd. (Marysville), and Summy. When Porter defaulted on the Marysville note, Marysville foreclosed and became the owner of the property.

Friery purchased the property from Marysville in May 1988. She acquired title subject to the Jarvis and Sutter Buttes promissory notes, which were then both in default; Friery cured the arrearages on both notes, but refused to assume the Sutter Buttes loan.

In 1991 Friery sold Center Street to Herminito and Eloisa Briones. As part of the sale, Friery took back a note secured by a deed of trust in the principal amount of $68,000, due on September 16, 1996. The deed of trust was recorded on September 20, 1991, making it junior to the existing Sutter Buttes deed of trust.

In October 1991 Sutter Buttes sent notice to Briones, Friery, and Ferraiuolo demanding payment in full of all principal and interest on the Sutter Buttes note, pursuant to the due on sale clause, as the result of the transfer of the property to Briones, whom Sutter Buttes deemed uncreditworthy. The letter led to a "workout agreement" between Sutter Buttes and Briones, allowing the Brioneses to assume the Sutter Buttes loan. The assumption agreement, executed in March 1992, included a modification of the terms of the original promissory note—the maturity date was advanced from May 1, 2001, to October 1, 1996 (15 days after the Friery note was due), and the Brioneses were required to pledge two parcels of real property as additional security. According to Friery's declaration, which we assume is true, the modification agreement was accomplished without her knowledge or consent.

In 1993, Friery tried to sell her note in an effort to raise cash. During the course of that unsuccessful endeavor, she learned of the modification to the Sutter Buttes note.

In May 1995 Briones stopped making payments on the Friery note. In October 1995, the Brioneses defaulted on the Sutter Buttes note.

After serving Briones with a notice of acceleration, Sutter Buttes filed an action for judicial foreclosure. Friery, a junior lienholder, was named as a defendant.

---

[2]The loan was actually made by Sutter Buttes Savings & Loan Association, predecessor in interest to plaintiff Sutter Buttes Savings Bank, F.S.B.

Friery answered and cross-complained for declaratory and equitable relief. Friery alleged that the 1992 assumption agreement modifying the terms of the senior loan so increased the likelihood of Briones's default as to amount to a substantial impairment of her security interest. As a consequence, Friery sought to have the court equitably declare her lien superior to that of Sutter Buttes.

The trial court granted Sutter Buttes's motion for summary judgment on two grounds: (a) the *Gluskin* case, on which Friery relied, was distinguishable, and (b) even if the court agreed that a duty existed under *Gluskin*, the modification agreement did not substantially impair Friery's security because it did not affect Briones's ability to make regular payments when due. Friery appeals.

APPEAL

I

*Summary Judgment Principles*

A motion for summary judgment will be granted if the moving papers establish that there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Jacobs* v. *Fire Ins. Exchange* (1995) 36 Cal.App.4th 1258, 1268 [42 Cal.Rptr.2d 906].) A defendant will be entitled to summary judgment either by proving that one or more elements of the plaintiff's cause of action cannot be established, or by establishing an affirmative defense as a matter of law. (Code Civ. Proc., § 437c, subd. (n).) ■ Since a summary judgment motion raises only questions of law regarding the construction and effect of the supporting and opposing papers, we independently review them on appeal. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].)

II

*The Gluskin Case*

The viability of Friery's cross-complaint seeking a judicially declared reversal of statutory lien priority depends upon the existence of a duty on the part of Sutter Buttes to refrain from making any modification to its senior indebtedness which could substantially impair the security of Friery's junior note or increase the likelihood of default. If we find such a duty exists, we must then determine whether there is a genuine factual controversy over

whether the 1992 Briones modification agreement breached that duty. However, if the bank owed no duty, our inquiry is over and we must affirm the judgment.

The duty sought to be imposed on Sutter Buttes in this case is asserted to be a natural outgrowth of the *Gluskin* case. In *Gluskin v. Atlantic Savings & Loan Assn., supra,* 32 Cal.App.3d 307, the plaintiff sold raw land to a buyer for $400,000 and took back a note for $175,000 secured by a deed of trust on the property. The buyer took out two 30-year construction loans to build homes on the property, totaling about $3.5 million. Plaintiff promised to subordinate its deed of trust to those of the construction lender as part of an overall written agreement to develop the property and share the profits therefrom. (*Id.* at pp. 309-311.)

When the new housing market turned sour, the buyer and the lender restructured the loan "in what the trial court mildly referred to as a substantial and drastic manner." (*Gluskin v. Atlantic Savings & Loan Assn., supra,* 32 Cal.App.3d at p. 312.) The principal on the larger note was reduced from over $2 million to $712,000, the interest rate was raised from 6¼ percent to 10 percent and the maturity date advanced from 30 years to 10 months. The modification agreement falsely stated that no one else had an interest in the property. (*Ibid.*)

Plaintiff appealed from a judgment declaring the lender's lien superior to its own, and the Court of Appeal reversed. Recognizing the vulnerability of a subordinating seller who willingly takes a junior position in reliance on the fact that a construction loan will be used to enhance the value of the property, the *Gluskin* court noted that " ' ". . . rights of priority under an agreement of subordination extend to and are limited strictly by the express terms and conditions of the agreement." ' " (32 Cal.App.3d at p. 313, citing *Miller* v. *Citizens Sav. & Loan Assn.* (1967) 248 Cal.App.2d 655, 662-663 [56 Cal.Rptr. 844].) Consequently, where a subordinated construction lender could or has misused the loan proceeds to the prejudice of the subordinating seller, courts have protected the seller on the theory that the lender owes an implied good faith duty inherent in the subordination agreement. (32 Cal.App.3d at pp. 313-314, citing *Middlebrook-Anderson Co.* v. *Southwest Sav. & Loan Assn.* (1971) 18 Cal.App.3d 1023, 1036 [96 Cal.Rptr. 338]; see also *Handy* v. *Gordon* (1967) 65 Cal.2d 578, 581 [55 Cal.Rptr. 769, 422 P.2d 329, 26 A.L.R.3d 848].)

*Gluskin* found that these same public policy considerations warranted special protection for the subordinating seller where the buyer and lender enter into an agreement between themselves "whose result is to destroy a

seller's [security] interest." (32 Cal.App.3d at p. 315.) The court announced the rule that ". . . a lender and a borrower may not bilaterally make a material modification in the loan to which the seller has subordinated, without the knowledge and consent of the seller to that modification, if the modification materially affects the seller's rights." (*Id.* at p. 314.) If such an agreement "so modifies the terms of the senior loan that the risk that it will become a subject of default is materially increased, then the buyer and the lender may subject themselves to liability to the seller if they proceed without the latter's consent, and if the seller's otherwise junior loan is to be adversely affected." (*Id.* at p. 315.).

## III

### *Post-Gluskin Developments*

Notwithstanding *Gluskin*'s carefully reasoned and narrowly drawn holding, commentators Miller and Starr have argued for a radical extension of the rule which would prevent *any* senior lienholder from entering into any modification agreement with the borrower materially affecting the junior's security interest without the latter's consent: "It is submitted that in any case where the senior lien is modified in any material manner which produces an important impact on the value of the junior lien, the modification should be junior to the second lien, and if that is not practical, the entire senior lien should become junior to the existing second lien." (3 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 8:83, p. 426 (Miller and Starr).) Another treatise writer, Richard Powell, gleans a more modest rule—that postlien *additions* to the original principal of the senior loan should lose their priority as to a junior lien if entered into without consent of the junior lienholder since they have worsened the junior's security, but modifications which merely alter the time period in which to pay off the senior loan should not result in a loss of priority. (4 Powell, Real Property (1997) § 37.31, p. 37-219.)[3]

The feasibility of a "partial reversal" of lien priority was presented squarely to this court in the case of *Lennar Northeast Partners* v. *Buice* (1996) 49 Cal.App.4th 1576 [57 Cal.Rptr.2d 435], the only published California decision to apply *Gluskin*.

In *Lennar*, the trustor executed a promissory note in favor of Bank of America in 1983 for $600,000 and gave a second note to plaintiff's predecessor in interest Chesapeake Savings and Loan for $700,000, which became

---

[3]Under Powell's rule, the Briones modification would *not* have been deemed material, since only the maturity date of the loan was affected; both the principal and the interest rate on the note remained unchanged.

the junior lien. In 1988 both notes were renegotiated and the junior lienholders executed subordination agreements. In 1993 the senior note was renegotiated without the participation or consent of the junior. The interest rate was changed from a variable prime plus 3 (9 percent at that time) to a fixed 12 percent rate, the maturity date was extended one year, and the principal was increased, thereby diminishing the return on the property and adversely affecting the value of the junior's security. On summary adjudication, the trial court, applying *Gluskin*, found that by substantially modifying the terms of the note, the senior forfeited the priority of its entire lien to the junior. (49 Cal.App.4th at pp. 1584-1585.)

*Lennar* reversed and directed the trial court to enter a new judgment declaring that only the modifications to the senior loan lost priority. While agreeing with the trial court that the changes to the senior loan were material as a matter of law, the court held that equitable relief under *Gluskin* could be fully accomplished by denying priority only to the modifications, thereby restoring to the junior the same position it enjoyed when it first agreed to subordinate. (49 Cal.App.4th at p. 1588.)

Although it acknowledges the proposed broadening of the rule by commentators Miller and Starr and Powell (*Lennar Northeast Partners* v. *Buice, supra,* 49 Cal.App.4th at p. 1587), *Lennar* cannot be read as presaging an expansion of *Gluskin* into uncharted territory. Like *Gluskin*, *Lennar* involved a subordination agreement by the junior which left it in an especially vulnerable position; thus, *Gluskin*'s applicability to the facts of the case was never in dispute. It is true the plaintiff in *Lennar* was a "hard money lender" rather than a seller. But the *Lennar* court expressly refused to decide whether public policy justified granting a subordinating hard money lender less protection than a subordinating seller, since the equities were served in either case by denying priority only to the modification rather than the entire loan. (49 Cal.App.4th at pp. 1587-1588.)[4]

Because *Lennar* involved an express subordination agreement by the junior lienholder, there is no merit to Friery's claim that its mention of the Miller and Starr comment indicates the court's "apparent approval" of an enlargement of the *Gluskin* rule. To the extent it amplifies *Gluskin*, *Lennar* stands simply for the proposition that the equitable relief afforded a junior lienholder must be narrowly circumscribed according to the facts of the particular case.

---

[4]By denying priority to "the modification," the *Lennar* court actually denied priority only to the *increase in the principal* of the original note. (49 Cal.App.4th at p. 1588.)

## IV

### *Expansion of Gluskin—A Question of Policy*

We now reach Friery's contention that we should extend *Gluskin* to any modification to a senior loan entered into without the consent of a junior lienholder which materially affects the security of the junior lien, as suggested by Miller and Starr.

The duty found in *Gluskin* is firmly grounded on contractual principles. A seller, a development company, and a construction lender entered into a tripartite agreement by which the seller conveyed raw land to the buyer, the buyer-developer took out a construction loan to build houses and the bank lent money, all to carry out a common purpose. By voluntarily agreeing to subordinate its deed of trust and waiving its right to supervise the loan proceeds, the unprotected seller relied on the other two parties to carry out the intended purpose of the agreement—to build houses, thereby enhancing the value of the secured property.

As *Gluskin* cautions, the risk of default is inherent in every subordination situation. Indeed it is "the very hazard to which a subordinating seller exposes himself by reason of a subordination agreement" and there is no duty in the abstract to protect against this risk. (32 Cal.App.3d at p. 315.) However, surreptitious agreements between the borrower and lender which effectively destroy the seller's security "if deliberately undertaken would entitle the seller, depending upon the facts of the case, to secure relief either upon the ground of fraud or pursuant to the requirement of fair dealing inherent in all contracts in general . . . and inherent in 'the philosophy of fair dealing' . . . as to subordination arrangements in particular." (*Ibid.*, citations omitted.)

*Gluskin* discerns a public policy need for protecting the seller from such reprehensible conduct even in the absence of a malevolent purpose. Read properly, *Gluskin* does no more than find a duty of good faith and fair dealing in a subordination agreement, preventing two of the parties from substantially impairing the third's interest in the joint enterprise. As the Ninth Circuit has explained, "[t]he rule articulated in *Gluskin* aims to protect subordinated sellers from secret agreements between buyers and lenders against the interest of the subordinated seller." (*Resolution Trust Corp.* v. *BVS Development, Inc.* (9th Cir. 1994) 42 F.3d 1206, 1215.)

No policy considerations of comparable magnitude exist in the relationship presented here. Friery subordinated to no one. A sophisticated loan

broker, she took a calculated investment risk. She bought the property in a distressed condition, cured the outstanding loan delinquencies, turned it around and then sold it to a third party without the consent of Sutter Buttes, taking back a $68,000 note secured by a junior deed of trust. Friery not only refused to assume the Sutter Buttes loan at the time she acquired the property but she knew or should have known that selling it to a third party without the bank's consent would trigger the due on sale clause, as indeed it did. Sutter Buttes responded by renegotiating the terms of the note with the borrowers to protect its security. It undertook no express or implied contractual duties toward Friery and stood in no special relationship to her. On the contrary, Friery's relationship to the bank was nothing more than that of a competing lienholder on the same property.

Miller and Starr offer no justification for creating an unlimited duty on the part of all senior lenders not to modify their loans "in any material manner which produces an important impact on the value of the junior lien" other than the fact that the junior may suffer as a result. (3 Miller & Starr, *supra*, § 8:83, p. 426.) However, this view fails to take into account that applying *Gluskin* in such a sweeping fashion might upset established rules of lien priorities and foster uncertainty and instability in the lending market, as is illustrated here.

California follows the "first in time, first in right" system of lien priorities (Civ. Code, § 2897; 3 Miller & Starr, *supra*, § 8:1, p. 269), a system whose legacy harkens back to the days of the gold rush. (See *In re Water of Hallett Creek Stream System* (1988) 44 Cal.3d 448, 462 [243 Cal.Rptr. 887, 749 P.2d 324]; *People* v. *Shirokow* (1980) 26 Cal.3d 301, 308 [162 Cal.Rptr. 30, 605 P.2d 859].) A seller who invests in a second deed of trust accepts all the risks of the junior position. She gambles that the equity in the property will be sufficient to cover her investment in a worst case scenario—a foreclosure sale. Where, as here, she sells the property without accommodating the senior lienholder, she takes the risk the anvil will fall—the senior will "call" the loan and demand full payment, or require the new buyer to assume the loan on terms which enhance the value of the lender's security position. The senior has a "valid and enforceable privilege" of accelerating the note upon transfer of title. (4 Miller & Starr, *supra*, § 9:84, p. 248.)[5] It would defy logic to conclude that taking the lesser step of renegotiating the loan to protect its lien may subject the senior to the loss of priority unless the junior "consents" to it. Absent facts giving rise to a special relationship between the senior and the junior, such a rule would amount to the "tail wagging the dog."

---

[5]The fact that Sutter Buttes failed to enforce the due on sale clause in transfers prior to Briones is irrelevant. A waiver of the right to accelerate upon one transfer does not constitute a waiver as to subsequent transfers. (4 Miller & Starr, *supra*, § 9:90, p. 275.)

Friery's posited duty echoes a similar claim made by the junior lienholders in *Connor* v. *Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224]. In *Connor*, a group of home buyers sought relief against Great Western, the construction lender, when their houses in a newly constructed housing tract exhibited severe cracking due to poor design. The evidence showed Great Western was intimately involved in building the tract, reaped handsome fees from the enterprise, and had the right to control the activities of the contractor. The California Supreme Court held "Great Western became much more than a lender content to lend money at interest on the security of real property. It became an active participant in a home construction enterprise." (*Id.* at p. 864.) Public policy therefore dictated the imposition of a duty of reasonable care on the part of the bank to the home buyers, despite the absence of privity. (*Id.* at pp. 865-868.)

While finding a duty to the plaintiffs, *Connor* refused to hold the bank liable to junior lienholders on the property for impairment to their security. Unlike the home buyers, who were powerless to protect their equity against defective construction supervised by the bank, the junior lienholders were in a position to protect themselves by providing a margin of safety against the risk the notes would not be paid. (*Connor* v. *Great Western Sav. & Loan Assn., supra,* 69 Cal.2d at pp. 869-870.) "The balance of the [policy] factors . . . is significantly different when an investor in or pledgee of notes secured by second deeds of trust is substituted for a member of the home-buying public as the party claiming a duty of care on the part of the tract financier." (*Id.* at p. 870.)

Like the subordinating seller in *Gluskin,* the home buyers in *Connor* were placed in an especially vulnerable position vis-à-vis the lender. The defendants in both cases took on roles beyond that of a mere moneylender, participating in a joint enterprise for the ostensible benefit of the plaintiffs.

On the other hand Friery, like the junior lienholders in *Connor,* voluntarily assumed a security position which she knew carried an element of risk. As in *Connor,* the facts here do not cry out for the creation of a special duty on the part of the senior lender toward the junior. (See *Smith* v. *State Saving & Loan Assn.* (1985) 175 Cal.App.3d 1092, 1097 [223 Cal.Rptr. 298] [equitable subrogation not available to investor who "knowingly and willingly" accepts a junior lien position].) Renegotiation of the senior loan upon transfer of ownership without the lender's consent was precisely one of the hazards which Friery accepted when she sold the property and took back a second deed of trust. We see no public policy reason to saddle the bank with a duty of care to protect her security when its own superior lien was jeopardized by a sale of the property to a less solvent owner.

## V

### *Conclusion*

There is a vast chasm between the junior lienholder's position in *Gluskin* and Friery's in this case. We conclude the facts here do not call for the type of extraordinary equitable relief afforded in *Gluskin.* Summary judgment on Friery's cross-complaint was properly granted.

Because we find no duty, we need not reach the court's alternate ground for granting the summary judgment, i.e., that the modification was not "material" within the meaning of *Gluskin.*[6]

### DISPOSITION

The judgment is affirmed.

Puglia, P. J., and Blease, J., concurred.

---

[6]The parties engage in a spirited debate over whether the trial court properly sustained evidentiary objections to certain portions of the declarations submitted by Friery in opposition to summary judgment. Because the contested statements have relevance only if there was a duty on the part of Sutter Buttes in modifying the Briones note, we do not enter the fray.