[Civ. No. 39381. Second Dist., Div. Five. May 14, 1973.]

JACK J. GLUSKIN et al., Plaintiffs and Appellants, v.
ATLANTIC SAVINGS AND LOAN ASSOCIATION,
Defendant and Respondent.

308

## COUNSEL

Graham & James, Leo J. Vander Lans, Don A. Proudfoot, Jr., David A. Hayden, John R. Hetland and Anne T. Kneeland for Plaintiffs and Appellants.

Kellett, Oksner & Spada, Fitzpatrick & Wiley and D. Joseph Spada for Defendant and Respondent.

## OPINION

**COLE, J.**[*]—Plaintiff (a limited partnership, hereinafter called "D-B") sought a judgment in declaratory relief that the lien of a deed of trust held by it on 172 lots in a tract, was prior and superior to the liens of two deeds of trust held by defendant Atlantic Savings and Loan Association (Atlantic). The judgment was adverse to D-B and it appeals.

The issues arise out of a transaction wherein D-B was the seller of land to Pathfinder Development Co. (Pathfinder).[1] Pathfinder in turn borrowed substantial amounts of money from Atlantic for the purpose of constructing single family residences and allied improvements on the property. The precise controversy is whether a modification of one of the Atlantic-Pathfinder

---

[*]Assigned by the Chairman of the Judicial Council.

[1]Pathfinder was an original defendant in the action. It stipulated to judgment against itself and is not a party to this appeal.

loans[2] disturbed the priority that Atlantic had by reason of a subordination agreement or so prejudiced D-B as a junior lienor that it gained priority over Atlantic. The land sold amounts to 63 acres. The transaction between D-B and Pathfinder was reflected in a written agreement. The basic sales price was $400,000. D-B received a negotiable non-interest bearing promissory note secured by deed of trust for $175,000. The deed of trust contained a subordination provision in which D-B stated that it expressly subordinated the priority of its trust deed to Atlantic's two trust deeds which were "being recorded concurrently herewith." The subordination provision further provided that D-B understood that specific loans and advances were being made in reliance upon its agreement to subordinate. The subordination provision further stated that D-B had personal knowledge of and approved and consented to the provision of the loan agreement and escrow between Atlantic and Pathfinder. Among other things the agreement provided that Pathfinder was to pay to D-B as "additional consideration for and on account of the purchase price of the property, fifty percent . . . of all profits . . . earned by [Pathfinder] from the construction and sale of single family homes upon the property." All funds from the sale of homes were to be deposited in a trust account to be disbursed over the joint signatures of D-B and Pathfinder. The agreement provided that disbursements were first to be made to pay amounts required to carry the land, second to pay to D-B the balance on its deed of trust, third to repay to Pathfinder certain funds advanced by it and "Finally, additional funds representing profits shall be disbursed equally to [D-B] and [Pathfinder], except that when it is known that the project will earn less than $400,000, $10,000 shall be distributed from the trust account to [D-B]." It was anticipated that construction loans would be sufficient to carry the project. All costs of ownership were the sole obligation of Pathfinder and it agreed to hold D-B harmless from them.

The general partners of D-B were one individual and three California corporations. There were a number of limited partners. In their dealings with Pathfinder the partnership was represented solely by David Zerner. Zerner was a lawyer whose practice included many years of experience in real estate investment. He was president of one of the corporations which was a general partner in the D-B limited partnership. He was the individual who was active on behalf of D-B in entering into the agreement just described. D-B had acquired title to the land involved in this litigation by

---

[2]The second loan was also modified but not in any substantial way. This minimal modification is not attacked by D-B. The trust deed securing this loan may have retained its priority in any event. (Cf. *Carpenson v. Najarian,* 254 Cal.App.2d 856 [62 Cal.Rptr. 687].)

reason of a prior investment in the Diamond Bar area. The main interest of the D-B partners in entering into the current transaction with Pathfinder was to get back their investment in the land. There had been a previous Diamond Bar venture between D-B and Pathfinder which D-B conceded was a joint venture.

Pathfinder secured two construction loans from Atlantic. One, in the face amount of $1,142,560 was secured by a trust deed on 44 of the 172 lots; the other in the face amount of $2,426,580 was secured by a trust deed on the remaining 117 lots. Each note was payable in 30 years. Atlantic required that its deeds of trust be recorded prior to D-B's. In the borrower's instructions Atlantic also caused Pathfinder to represent that no one other than Pathfinder had any interest in the premises. The note for $2,246,580 was payable in 30 years and bore interest at the rate of 6¼ percent and called for monthly payments in excess of $15,000. The loan documents between Atlantic and Pathfinder were all furnished to Zerner and he looked at them before the subordination agreement was signed.

The escrow instructions between Pathfinder and D-B contained language dealing with subordination of D-B's deed of trust.[3] Among the provisions was D-B's agreement that Atlantic had no obligation or duty in disbursing the loan proceeds to see to their application by Pathfinder and the further agreement that any diversion by Pathfinder of such funds would not defeat the subordination agreement.

---

[3]"Beneficiary declares and acknowledges that he hereby intentionally waives, relinquishes, and subordinates the priority and superiority of the lien or charge of this deed of trust, in favor of the lien or charge upon said land of the deed of trust in favor of ATLANTIC SAVINGS AND LOAN ASSOCIATION, a corporation, being recorded concurrently herewith, and that he understands that in reliance upon and in consideration of this waiver, relinquishment and subordination specific loans and advances are being and will be made, and as part and parcel thereof specific monetary and other obligations are being and will be entered into by third parties which would not be made or entered into but for said reliance upon this waiver, relinquishment and subordination.

"The Beneficiary does hereby declare that Beneficiary has personal knowledge of and does hereby approve and consent to all the provisions of the loan, escrow and loan agreement between Owner and Lender for the disbursement of the proceeds of the loan of the Lender, and further agrees that the Lender in making disbursement pursuant to said loan agreement is under no obligation or duty nor has the lender made any representation that it will see to the application of such disbursement by the Owner and any diversion by the Owner will not defeat this Agreement of Subordination as to the funds so diverted.

"This Agreement contains the whole agreement between the parties hereto as to the deed of trust loans, and the priority thereof, herein described and there are no agreements written or oral outside or separate from this Agreement and all prior negotiations, if any, are merged into this Agreement."

The controversy in this case comes from the fact that as of March 1, 1966, and as a consequence of a very poor market for the sale of single family residential homes[4] Atlantic and Pathfinder modified this note in what the trial court mildly referred to as a substantial and drastic manner. The principal amount of the loan was reduced to $712,530, the interest rate was raised from 6¼ percent to 10 percent, the monthly payments reduced to approximately $5,900 and the maturity of the note shortened to 10 months (with a balloon payment at the end). The modification agreement contained Pathfinder's representation that no one else had any interest in the premises securing the deed of trust.

D-B argues that this change was made "in utter disregard" of its rights. It asserts that the modification allowed Atlantic to escape its obligation to disburse construction funds and to obtain the property for itself without having to pay D-B the balance owing on the sales price. This latter contention is based on the fact that Pathfinder ultimately defaulted in payment of its two notes and that Atlantic purchased the property at a foreclosure sale.

The trial court entered judgment for Atlantic. It found that "D-B through both a joint venture relationship with Pathfinder and direct communication with Pathfinder had knowledge of all of Pathfinder's activities and of the modification agreement and consented thereto." It further found that it was Pathfinder's default and not the modification that caused the forseclosure. It found and concluded that the modification did not prejudice D-B. Its conclusions are set forth in full in the margin.[5]

---

[4]The trial court found to this effect and its finding is properly grounded in the testimony of a former officer of Pathfinder.

[5]"1. The subordination provision in D-B's trust deed did not condition the priority of Atlantic's deeds of trust.

"2. Atlantic's deeds of trust had priority over D-B's trust deed by virtue of the fact of prior recordation.

"3. Atlantic's deeds of trust had priority over D-B's trust deeds by virtue of the subordination provision in D-B's trust deed.

"4. None of the agreements or acts of Atlantic subsequently to the execution of D-B's trust deed containing the subordination provision in any way altered or affected the priority of Atlantic's deeds of trust.

"5. D-B and Pathfinder were joint adventurers in connection with the 172 house project.

"6. There was no causal connection between the modification of Loan Nos. 15455 and 15456 and the foreclosure of the deeds of trust securing the loans.

"7. The modification of the two loans did not prejudice D-B's security interest under its deed of trust."

We pause but briefly to recite the law applicable to subordination arrangements. They ". . . are in the nature of a mutual enterprise, wherein the vendor provides the land, the purchaser the 'know how' and the purchaser's lending agency the capital, for the mutually beneficial purpose of developing the land and disposing of it (usually by sale; occasionally by rental), to provide a fund out of which the vendor is paid for his land, the lender is repaid its loan with interest, and the purchaser receives compensation for his efforts and skill.■■■ Because of their nature, 'The law is well settled that rights of priority under an agreement of subordination extend to and are limited strictly by the express terms and conditions of the agreement. [Citations.]' (*Irvine* v. *California Cotton Credit Corp.* (1937) 18 Cal.App.2d 761, 763 [64 P.2d 782].)" (*Miller* v. *Citizens Sav. & Loan Assn.*, 248 Cal.App.2d 655, 662-663 [56 Cal.Rptr. 844].) A perceptive summary of the obligations of lenders to sellers in connection with subordination arrangements is set forth in *Middlebrook-Anderson Co.* v. *Southwest Sav. & Loan Assn.*, 18 Cal.App.3d 1023 [96 Cal.Rptr. 338], We agree with the principles of law set forth in *Middlebrook.*[6]

We recognize the vulnerable position in which a seller who agrees to subordinate his purchase money deed of trust may find himself. The "strong public policy reasons" to protect the seller in subordination situations (*Middlebrook-Anderson Co.* v. *Southwest Sav. & Loan Assn.*, *supra*, 18 Cal.App.3d at p. 1036) clearly spelled out in *Handy* v. *Gordon*, 65 Cal.2d 578 at p. 581 [55 Cal.Rptr. 769, 422 P.2d 329, 26 A.L.R.3d 848], do not need to be repeated here.

The seller's vulnerability has most often been the subject of discussion in cases where the issue was the lender's responsibility to see to it that funds advanced to the developer-buyer were used by the latter for the construction purposes contemplated by the subordination transaction. (See

---

"[4]'In effect, the seller is assisting in the financing of the buyer's development and becoming a quasi "joint venturer" in the project. The safety of his "investment" depends upon the success of the development, for as soon as the new lien is imposed on the property to secure the construction loan, the property is over-encumbered. . . .'"

[6]Our agreement with *Middlebrook* explains why we disagree with the trial court's second conclusion of law—that Atlantic's deeds of trust had priority over D-B's trust deed by virtue of the fact of prior recordation. As *Middlebrook* clearly points out ". . . there is no justification, legal or otherwise, which would call for a different result whether the seller in a joint transaction records first and then agrees that his lien will be subordinated or whether he agrees that the lender may achieve priority through first recording." (18 Cal.App.3d at p. 1034.)

cases discussed in *Middlebrook, supra,* 18 Cal.App.3d at pp. 1031-1033.) It is in that context that *Middlebrook* imposed on the lender the obligations of an implied agreement that the lender's priority extended only to loan amounts properly expended for construction purposes and it is in that context that a seller needs protection. In *Middlebrook* (which involved dismissal after demurrers were sustained without leave to amend) the court was concerned with allegations that the lender voluntarily undertook to control disbursements from the construction loan fund; that the seller did not attempt to follow the progress of the construction or the status of the disbursements because it relied on the lender's controls, and that the lender owed a duty to the seller because the lender voluntarily assumed control of the disbursements, knew of the seller's security interest and knew that the seller's lien was subordinated only on condition that loan funds were to be used just for construction purposes. The court held that the loan "under the circumstances" (18 Cal.App.3d at p. 1037) could not be viewed other than as subject to fair application of the construction proceeds and accordingly a cause of action arose in favor of the seller. In the instant case D-B expressly waived any rights to require Atlantic to look to the application of the loan funds by Pathfinder. D-B thus gave up the major protection to which sellers who subordinate their otherwise prior liens are entitled.[7]

██ In this light if Atlantic has a duty to protect D-B's security interest that duty must be based on considerations other than those involved in the cases relied upon by D-B (*Middlebrook-Anderson Co.* v. *Southwest Sav. & Loan Assn., supra,* 18 Cal.App.3d 1023; *Miller* v. *Citizens Sav. & Loan Assn.,* 248 Cal.App.2d 655 [56 Cal.Rptr. 844]; *Radunich* v. *Basso,* 235 Cal.App.2d 826 [45 Cal.Rptr. 824]; *Collins* v. *Home Savings & Loan Assn.,* 205 Cal.App.2d 86 [22 Cal.Rptr. 817]) since in each of them the lender had an express or implied duty to the seller to see to the proper application of the loan funds. We hold that those other considerations are found in the public policy which requires protection of subordinating sellers and that a lender and a borrower may not bilaterally make a material modification in the loan to which the seller has subordinated, without the knowledge and consent of the seller to that modification, if the modification materially affects the seller's rights. If convinced that there is a sound business reason for a modification a prudent seller presumably will consent to it. If not so convinced, he will not consent and will be faced with no greater risk to his subordinated loan than was inherent

---

[7]This case does not present questions related to the definitiveness and specificity required in subordination agreements as to the terms and provisions of the loans and similar matters. (See *Handy* v. *Gordon, supra,* 65 Cal.2d 578.)

in the very nature of the transaction. If dispute results from an unconsented to modification it is of course a question of fact whether the modification materially affected the rights of the subordinated seller.

The risk that the buyer-borrower will default in its obligation to the lender and that a foreclosure by the lender will follow is, of course, the very hazard to which a subordinating seller exposes himself by reason of a subordination agreement. In the abstract, there is no obligation on a lender to protect a subordinating seller from this risk. If an obligation to prevent a default of any sort was automatically created in every subordination situation no subordination arrangement could ever effectively accomplish its purpose. But this is not to say that a lender and a buyer can enter into an agreement or a course of conduct between themselves whose result is to destroy a seller's interest. Such an agreement or conduct if deliberately undertaken would entitle the seller, depending upon the facts of the case, to secure relief either upon the ground of fraud or pursuant to the requirement of fair dealing inherent in all contracts in general (see 1 Witkin, Summary of Cal. Law, pp. 271-272) and inherent in "the philosophy of fair dealing" (*Middlebrook-Anderson Co.* v. *Southwest Sav. & Loan Assn., supra,* 18 Cal.App.3d at p. 1037) expressed in *Handy* v. *Gordon, supra,* 65 Cal.2d 578 and *Middlebrook* as to subordination arrangements in particular.[8] The absence of malevolent purpose does not itself immunize the buyer and the lender. If, however innocently, their bilateral agreement or conduct so modifies the terms of the senior loan that the risk that it will become a subject of default is materially increased, then the buyer and the lender may subject themselves to liability to the seller if they proceed without the latter's consent, and if the seller's otherwise junior loan is to be adversely affected.

■ Here, as noted above, the trial court found that D-B knew of and consented to the modification agreement both by reason of a joint venture relationship and direct communication with Pathfinder. D-B attacks this finding. As to the existence of a joint venture, D-B spends a good portion of its brief urging that there is a difference between the "quasi joint venture" inherent in any seller-buyer-lender subordination situation and a standard or classic joint venture. Of course there is. "Quasi joint venture" is no more

[8]No fraud on the part of Atlantic is claimed in this case. The possibility that in any subordination situation the lender and the buyer may so act as to create an obligation on the part of the lender to the seller explains in part our disagreement with the trial court's first conclusion in this case that the subordination provision in D-B's trust deed did not condition the priority of the Atlantic deed of trust. The possibility of liability in the event of improper conduct must always condition the lender's priority.

than a loose description, not a definition of the relationship between the parties to a subordination transaction.

D-B asserts that there was no evidence whatsoever of the existence of a standard joint venture. "Whether a joint venture exists must largely depend upon determining the intention of the parties from the facts of a particular case because there is no certain and all-inclusive definition to be applied." (*Holtz* v. *United Plumbing & Heating Co.,* 49 Cal.2d 501, 506 [319 P.2d 617].)

We need not pause to examine the testimony to see if there is substantial evidence to support the trial court's finding of the existence of a joint venture because it is clear to us that there is no substantial evidence to support the implied finding that Pathfinder had authority to commit D-B to the modification that was undertaken in this case. Assuming the existence of a joint venture, each joint venturer would have authority only to bind the others to contracts reasonably necessary to carry out the enterprise. (E.g., *Medak* v. *Cox,* 12 Cal.App.3d 70, 76 [90 Cal.Rptr. 452] and cases cited.) The applicable statute is Corporations Code section 15009 which provides in relevant part: "(1) Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority. (2) An act of a partner which is not apparently for carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners. (3) Unless authorized by the other partners or unless they have abandoned the business, one or more but less than all the partners have no authority to: (a) Assign the partnership property in trust for creditors or on the assignee's promise to pay the debts of the partnership. (b) Dispose of the good will of the business. (c) Do any other act which would make it impossible to carry on the ordinary business of a partnership. . . ."

It is noteworthy that the modification agreement provided in part "Borrower expressly represents, and this agreement is executed by the Beneficiary and is to be effective only upon the condition, that the premises described in said deed of trust are subject to no encumbrance subsequent to said deed of trust and that no one other than the Borrower has any interest in the premises securing said deed of trust; except: no exceptions." This

language appearing in the bipartite agreement between Atlantic and Pathfinder[9] could be read as negating the existence of a joint venture. We need not further inquire into this question, however, because in any event the language is a clear negation of any authority in Pathfinder to bind D-B. The only evidence of which we are aware which could possibly be construed to support a finding that D-B consented to Pathfinder's acting for it in connection with the modification agreement is found in Zerner's testimony set out in the footnote.[10]

Zerner expressly testified that D-B did not consent to the modification and that he would not have approved it if he had been consulted about it. He also testified that Pathfinder was competent to do the project but not to decide what should be done as far as D-B was concerned.

Pathfinder's consent to the modification agreement is clearly at the very least "[a]n act . . . which is not apparently for carrying on of the business of the [joint venture] in the usual way. . . ." (Corp. Code, § 15009, subd. (2).) Atlantic suggests to us that implicit in the agreement between Pathfinder and D-B was an agreement that houses would not be constructed if they would not sell. Since a representatiive of Pathfinder testified that at the time of the modification it was contemplated that construction on the tract covered by the modified trust deed would be postponed, Atlantic argues that the poor climate for selling houses makes the decision to postpone construction a reasonably necessary one, and one within Pathfinder's authority. We do not agree. The postponement, coupled with the tremendously shortened term of the loan and the very large balloon payment due at the end of that term, clearly enhanced the likelihood of a default by Pathfinder and the consequent foreclosure.

---

[9]Similar language appears in the borrower's instructions earlier executed by Pathfinder to Atlantic.

[10]"Q After the transfer of the property from D-B to Pathfinder, what part did D-B play in making any decisions regarding the project?

"A Nothing. The funds came out of the sales. I mean, I had that agreement, you know, that they wouldn't take the money which I felt, you know, to be sure I got my money out first.

"Q What about as far as making any decisions?
"A I don't know anything about that.

"Q I take it then you were leaving all the decisions in that regard to Pathfinder?
"A Absolutely.

"Q You were satisfied from previous dealings with Pathfinder that they were competent and would act in the best interests of the project?
"A They are experienced builders.

"Q Were you satisfied with their competence?
"A Yes.

"Q Were you satisfied they would make the correct decisions in your behalf?
"A Yes, I left it to them."

The court also found that by direct communication with Pathfinder D-B had knowledge of Pathfinder's activities and of the modification agreements and consented thereto. We have examined the portion of the transcript relied upon by Atlantic to support that finding and find that there is no evidence at all of any ponderable legal significance to uphold the finding.

In sum, we are faced with a trial court decision based on several erroneous premises of law and on factual testimony which is marginal at best. We are not the fact finders. We cannot tell from this state of affairs whether, given the principles of law set forth in the opinion the trial court would have reached the same result. It is therefore necessary that the judgment be reversed.[11]

Stephens, Acting P. J., and Ashby, J., concurred.

A petition for a rehearing was denied June 13, 1973, and respondent's petition for a hearing by the Supreme Court was denied July 25, 1973.

---

[11]The trial court also concluded that there was no causal connection between the modification and the foreclosure and consequently that the modification did not prejudice D-B's security interest. These conclusions are apparently premised on the theory that Pathfinder would have defaulted anyway. Be that as it may, it was the modified agreement that was foreclosed and it is this foreclosure which, under the trial court's reasoning, has caused Atlantic to cut off D-B's rights in the property. D-B therefore has been prejudiced by the modification. We cannot tell what it would have done with its right of reinstatement (Civ. Code, § 2924, subd. (c)) had the loan not been modified.

It is intriguing to note that Atlantic itself states in its brief that "[t]he modification agreement itself was conditioned on there being no junior lien, so that as far as D-B was concerned, there never was a modification . . ." That concession seemingly recognizes the principles which we have enunciated herein and seemingly makes this entire litigation an exercise in superfluity.