Filed 11/1/21  SMN Lo, Inc. v. M & A Enterprises CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| SMN LO, INC., | |
| Plaintiff and Respondent, | E075136 |
| v. | (Super.Ct.No. CIVDS1704874) |
| M & A ENTERPRISES, LLC, | OPINION |
| Defendant, Cross-complainant and Appellant; | |
| HANH THI TRAN, | |
| Cross-defendant and Respondent. | |

APPEAL from the Superior Court of San Bernardino County.  Wilfred J. Schneider, Jr., Judge.  Affirmed.

Law Offices of Russell J. Thomulka and Russell J. Thomulka for Defendant, Cross-complainant and Appellant M & A Enterprises, LLC.

Law Offices of Hector C. Perez and Hector C. Perez for Plaintiff and Respondent SMN Lo Inc.

1

Law Office of Nam T. Tran and John J. Mendoza for Cross-defendant and Respondent Hahn Thi Tran.

## I.  INTRODUCTION

This case involves competing claims of priority among the beneficiaries of several deeds of trust on a 12-unit apartment building in Ontario (the Ontario property). Defendant, cross-complainant, and appellant M & A Enterprises, Inc. (M & A) held a second-position deed of trust, securing a $160,000 note.[1]  Plaintiff and respondent SMN LO, Inc. (SMN), and cross-defendant and respondent, Hanh Thi Tran (Tran), respectively, held third- and fourth-position deeds of trust, securing notes for $110,000 and $200,000.  FCI Lender Services, Inc. (FCI), which is not a party to this action, held an undisputed first-position deed of trust, securing $725,000.

After Tran's deed of trust was recorded, M & A recorded a modification of its second-position deed of trust, increasing the secured debt from $160,000 to $410,000, making the entire $410,000 debt immediately due and payable and advancing the maturity date of the $160,000 debt.  M & A then commenced nonjudicial foreclosure proceedings on its *original* second-position deed of trust, securing $160,000.  M & A paid FCI over $825,000 to pay off the amount secured by FCI's first-position deed of trust.  M & A also collected rents on the property and paid real property taxes, insurance premiums, and other expenses associated with the property.

---

[1]  The stated amounts secured by identified deeds of trust are the original principal sums and do not include interest or other charges.

SMN filed this action shortly after M & A commenced a nonjudicial foreclosure on its original second-position deed of trust. Pending trial, the court allowed M & A to proceed with its foreclosure sale but required any sales proceeds above $160,000 to be held in escrow. Following a bench trial, the court issued a statement of decision and judgment, placing SMN's and Tran's deeds of trust in first and second position, respectively, senior to all other liens. This made M & A's deed of trust, and the monies that M & A paid FCI to pay off FCI's first deed of trust, junior to SMN's and Tran's deeds of trust. SMN and Tran were also awarded their attorney fees and costs incurred in this action, if they could show their entitlement to attorney fees based on statute or contract.

M & A claims that its *original* second-position deed of trust, securing the $160,000 sum, plus the amounts M & A paid to FCI to pay off FCI's first-position deed of trust (Civ. Code, § 2876), should be deemed senior to SMN's and Tran's deeds of trust. We disagree and affirm the judgment. M & A's original second-position deed of trust securing the $160,000 sum, together with the amounts that M & A paid to satisfy the first-position deed of trust, was equitably placed junior to SMN's and Tran's deeds of trust. As the trial court found and substantial evidence shows, M & A did not show that it had a "valid lien" against the Ontario property for any amount.

## II.  FACTS AND PROCEDURE

A. *The Four Trust Deeds on the Ontario Property*

In 2015, Neram Group, Inc. (Neram), owned the Ontario property, then worth around $1.1 million.  In 2015 and 2016, Neram executed four deeds of trust against the Ontario property, securing notes or debts as follows:

1.  FCI's first-position deed of trust (the First DOT), recorded on August 3, 2015, securing a $725,000 note to FCI.

2.  M & A's second position deed of trust (the Second DOT), recorded on September 18, 2015, securing a $160,000 note to M & A.  M & A's note accrued interest at 12 percent per annum, and required monthly interest-only payments of $1,600, beginning on October 1, 2015.  The note did not state when the unpaid principal was due and payable.  The Second DOT also did not contain a future advance clause; it did not allow M & A to make additional loans to Neram, which would be secured by the Second DOT in addition to the $160,000 note.  (*Oaks v. Weingartner* (1951) 105 Cal.App.2d 598, 601-602; Civ. Code, § 2884.)

3.  SMN's third-position deed of trust (the Third DOT), recorded on September 24, 2015, securing a $110,000 note to SMN.  SMN's note accrued interest at 10 percent per annum and required monthly interest and principal payments of $916.67, with unpaid principal and interest due in full on March 24, 2016.

4.  Tran's fourth-position deed of trust (the Fourth DOT), recorded on May 31, 2016, securing a $200,00 note to Tran.  Tran's note accrued interest at

4

10 percent per annum, required interest-only monthly payments of $1,666.66, and was due in full on November 30, 2016.

5. A modification of the Second DOT in favor of M & A, recorded on October 19, 2016, securing a modified $410,000 debt to M & A, due in full on November 15, 2015, around 11 months before the modification was recorded (the modified Second DOT). The modification included a "loan modification agreement" (the LMA), signed and notarized on November 15, 2015, by and between Neram and M & A.

The LMA stated that it "amend[ed] and supplement[ed]" the Second DOT by increasing the $160,000 note secured by the Second DOT to $410,000—an increase of $250,000. The modified $410,000 note accrued interest at 12 percent per annum, and required monthly principal and interest payments of $4,100.00, but the entire $410,000 balance was due on November 15, 2015, the same date that the $160,000 note was modified and increased to $410,000.

The LMA further stated that if the $410,000 modified note was not paid in full on November 15, 2015, interest would accrue on the $410,000 principal balance at 18 percent interest per annum. Thus, the LMA advanced the maturity date of the $160,000 debt from September 17, 2016, to November 15, 2015, and made the entire $410,000 modified note immediately due *and in default* on November 15, 2015.

B. *M & A's Nonjudicial Foreclosure Proceedings Under the Second DOT*

On October 20, 2016—the day after the modification of the Second DOT and the LMA were recorded—M & A caused to be recorded a notice of default and election to sell under its *original* Second DOT (the NOD). According to the NOD, $119,491.18 was

5

owed to M & A on the original Second DOT as of October 19, 2016. A notice of trustee's sale, recorded on February 1, 2017, set a trustee's sale on March 7, 2017, and stated that $296,744.07 was the estimated amount then due under the original Second DOT. The trustee's sale was postponed to March 28.

C. *The Pleadings*

### 1. SMN's Complaint

On March 20, 2017, SMN filed a verified complaint against M & A and Neram, alleging a cause of action for fraud and seeking declaratory and injunctive relief.[2] SMN later filed first and second amended verified complaints, naming a third defendant, County Records Research, Inc. (CRR), the trustee who was to conduct the nonjudicial foreclosure sale under M & A's original Second DOT.

SMN's second amended complaint (the SAC) alleged the following: Around September 2015, Neram approached SMN for the purpose of obtaining a loan secured by the Ontario property. At the time, the Ontario property was worth $1.1 million, and Neram falsely represented to SMN that the Ontario property was encumbered *only* by the First DOT for $725,000, recorded on August 3, 2015. Thus, SMN believed that Neram had $375,000 in "net equity" in the Ontario property.

---

[2]  On March 28, 2017, the court granted SMN's application for a temporary restraining order, stopping M & A's foreclosure sale. On April 18, the court denied SMN's request for a preliminary injunction restraining the sale and, instead, allowed the sale to proceed but required any sales proceeds in excess of $160,000 to be held in escrow. SMN was ordered to post a $25,667.43 bond, representing two years' interest on $250,000 at 10 percent per annum.

"Unbeknownst" to SMN, when Neram falsely represented that the First DOT was the *only* encumbrance on the Ontario property, Neram had already obtained a $160,000 loan from M & A, secured by the Second DOT, recorded on September 18, 2015, with a maturity date of September 17, 2016. As a result, SMN's Third DOT, securing its $110,000 loan, which was recorded on September 24, 2015, was junior to M & A's Second DOT.

On November 15, 2015, Neram and M & A entered into the LMA, materially modifying the terms of the Second DOT by increasing the amount secured by the Second DOT from $160,000 to $410,000, and advancing the maturity date of the $160,000 debt, together with the additional $250,000 debt, to November 15, 2015. The LMA was made without SMN's knowledge or consent and was not recorded until after SMN "sought to foreclose" on its Third DOT.

Based on information and belief, the SAC further alleged that Neram and M & A conspired with each other to defraud SMN of its $110,000 loan by increasing the secured debt on the Ontario property in positions senior to SMN's Third DOT to amounts in excess of the value of the property, thus "destroying" SMN's security interest in the property and depriving SMN of its $110,000 loan. The SAC sought a judicial declaration of the parties' rights to the Ontario property, including that SMN's Third DOT was senior to M & A's Second DOT. The SAC sought injunctive relief, prohibiting M & A from foreclosing on the Ontario property, whether by a nonjudicial foreclosure sale or a judicial foreclosure action.

7

## 2. Tran's Complaint in Intervention

In June 2017, Tran moved to intervene in this action by filing her own complaint for declaratory and injunctive relief against M & A, Neram, and CRR. The motion was granted.

## 3. M & A's Cross-complaint for Judicial Foreclosure

In July 2017, M & A filed a verified cross-complaint for judicial foreclosure, naming Neram, SMN, and Tran as cross-defendants, alleging that M & A was entitled to foreclose on the Ontario property, and further alleging that SMN's Third DOT and Tran's Fourth DOT were junior to M & A's Second DOT. M & A claimed it was owed $119,491.18 as of October 19, 2016, when the NOD was recorded. But in April 2017, M & A paid off the entire $725,000 loan secured by the First DOT, by paying FCI $738,605.02. M & A also claimed it was entitled to recover taxes and insurance premiums it paid to protect its Second DOT security interest.

## D. *The Bench Trial*

The matter proceeded to a bench trial on November 12 and 13, 2019. SMN, Tran, and M & A presented evidence.[3]

## 1. SMN's and Tran's Evidence

In September 2015, Neram's president, N.A., through a real estate broker, K.N., approached SMN for a $110,000 loan, to be secured by the Ontario property. SMN made

---

[3] Before trial, Neram's and CRR's defaults were entered on SMN's complaint, and Neram's default was entered on M & A's cross-complaint.

8

the $110,000 loan after SMN's research showed that the Ontario property was worth $1.1 million, and there was only one recorded lien on the property for $725,000.

When SMN made the $110,000 loan around September 24, 2015, N.A., through the real estate broker, K.N., represented to SMN that SMN's $110,000 deed of trust would be in second position, behind the $725,000 First DOT. K.N. also told SMN that the First DOT was not in arrears. N.A. did not tell SMN about M & A's second DOT, securing $160,000, which was recorded on September 18. SMN did not obtain title insurance for its $110,000 loan. Neram did not pay any part of the $110,000 loan and was in default after it failed to pay the first monthly installment.

Around July 2016, SMN began to foreclose on its $110,000 Third DOT, but SMN "paused" the foreclosure after it discovered the existence of M & A's original $160,000 Second DOT. SMN later discovered the modified Second DOT and the LMA shortly after they were recorded in October 2016. The modified Second DOT "wipe[d] out" SMN's Third DOT. That is, after the modification to the Second DOT was recorded, Neram had insufficient equity in the Ontario property to pay SMN's $110,000 loan. SMN did not consent to M & A's recordation of the modified Second DOT or to the LMA. M & A also did not ask for SMN's consent to enter into the LMA or to record the modified Second DOT. SMN later discovered that M & A had paid off the First DOT.

M & A's sole member and manager, M.A., testified for SMN, pursuant to Evidence Code section 776, that M & A made more than five loans to N.A. totaling over $2 million, for properties other than the Ontario property, between January 2014 and February 2015. M & A did not transfer any funds to Neram at any time. Instead, the

9

$160,000 and $250,000 debts represented part of the over $2 million that M.A. had previously loaned N.A. "for other properties."[4]

M.A. did not understand that the original or the modified Second DOT would affect the rights of junior lienholders. N.A. "came up with" the $410,000 amount "out of the blue" because N.A. told M.A. that he wanted to pay M.A. "more." M.A. also did not know about the First DOT or how much the Ontario property was worth when he caused the original and modified Second DOTs to be recorded. Between June 2017 and November 1, 2019, M.A. received between $8,000 to $9,000 a month in rents from the Ontario property, pursuant to an assignment of rents from Neram.

Tran testified that she knew N.A. and that he was Neram's president. Through K.N., Tran loaned N.A. $200,000 on May 30, 2016, at 10 percent annual interest, secured by the Fourth DOT on Neram's Ontario property. The entire $200,000 loan, plus interest, was due on November 30, 2016, but the loan was never repaid. When she made the loan, Tran knew about the First, Second, and Third DOTs securing $725,00, $160,000, and $110,000, respectively.

2. M & A's Evidence

M.A. testified that he was 84 years old at the time of trial, and he could not recall some of the details concerning his real estate-related loans and transactions with N.A. and Neram. M.A. first loaned money to N.A. in 2015. N.A. was supposed to be recording

---

[4] At this point, the court noted, "[I]t's clear there was never any money transferred to [Neram]" In response, M & A's counsel noted, "They're all [N.A.] They're all him"; and the court responded, "These are all corporations, they're not [N.A.]"

10

deeds of trust securing M.A.'s loans., but M.A. later discovered that N.A. did not record the deeds of trust.

On September 1, 2015, N.A. acknowledged in writing that he owed M.A. $2,092,500, and that he, N.A., would secure the debt by giving M.A. or his company, M & A, deeds of trust on seven real properties that either he, N.A., or his corporate entities owned, including Neram's Ontario property. The $160,000 note secured by the original Second DOT was given to M & A pursuant to N.A.'s agreement to repay M.A. the $2,092,500 sum.

Between October 2016 and April 2017, M.A. paid off the First DOT. On October 14, 2016, M.A. paid FCI $57,992.90, the amount by which the $725,000 loan secured by the First DOT was then in arrears. Then, between November 2016 and February 2017, M.A. paid FCI three monthly payments of $6,639.79 and one payment of $13,946.43 to keep the $725,000 loan current. Finally, in April 2017, M.A. paid FCI the entire $733,765.74 balance due on the $725,000 loan, First DOT, pursuant to FCI's payoff demand. Thus, between October 2016 and April 2017, M.A. paid FCI a total of $825,624.44 to pay off the $725,000 loan secured by the First DOT.

In August 2017, M.A. began collecting rents on the Ontario property pursuant to Neram's assignment of rents. At the same time, M.A. began paying all of the expenses associated with the Ontario property, including trash, water, electricity, taxes, building maintenance and repairs, the rental permit, and evictions. At the time of trial, M.A. was unsure how much of N.A.'s over $2 million debt to M.A. had been paid. On November 12, 2019, M & A claimed it was owed a total of $1,576,645.97 on the Ontario

property, including amounts due on its Second DOT and the amounts it paid on the First DOT.

E. *The Statement of Decision and Judgment*

In its statement of decision, the court ruled that M & A's Second DOT, both as originally recorded and as modified, lost its priority to SMN's Second DOT and to Tran's Third DOT. Thus, the court ruled that SMN's "lien of $110,000 and Tran's lien of $200,000 are senior to all other liens and shall be considered [first] and [second], respectively, in order of priority to all other liens," and it entered judgment in favor of SMN and Tran on the complaint and cross-complaint.

Relying on *Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602 (*Gevorgian*) and *Gluskin v. Atlantic Savings & Loan Assn.* (1973) 32 Cal.App.3d 307 (*Gluskin*) the court reasoned: "Any modification to a senior mortgage that shortens the maturity date of the loan or increases the debt is considered a material modification, such that the senior mortgage will lose its priority to the junior mortgage."

The court found that the LMA materially modified the $160,000 note and the original Second DOT by shortening the maturity date of the $160,000 debt and increasing the debt to $410,000, thus exhausting Neram's equity in the Ontario property and rendering SMN's Third DOT and Tran's Fourth DOT "worthless."

The court noted Neram never made any payments on the $160,000 debt, and that N.A. was already in default on his debts to M.A. at the time of the November 15, 2015 LMA between Neram and M & A. Thus, the LMA "ensure[d]" that Neram would default on the modified Second DOT. The court found that the LMA was made without SMN's

12

consent, and that SMN would not have consented to the LMA had it known about it. The original Second DOT did not have a future advance clause, which would have notified subsequent lien holders, including SMN and Tran, that additional advances to Neram, made after the original Second DOT was recorded, would be secured by the original Second DOT. (*Oaks v. Weingartner*, *supra*, 105 Cal.App.3d at pp. 601-602.) Thus, any advances by M & A to Neram after the Second DOT was recorded were not secured by the Second DOT.

"Moreover," the court ruled, it "appear[ed]" that M & A had already received its lien amount on the Ontario property through collecting rents on the Ontario property. M & A admitted to receiving an assignment of rents for the Ontario property, beginning in August 2017 and, since that time, M & A had received "$8,000 to $12,000" a month in rents, but "no other accounting" of rents was offered into evidence. M & A was required to apply the rents it received to the debt it was owed. (*Strutt v. Ontario Sav. & Loan Assn.* (1972) 28 Cal.App.3d 866.)

Thus, the court ruled that M & A failed to meet its burden of showing that it had a valid lien on the Ontario property—a prerequisite to its claim for judicial foreclosure and any subsequent deficiency judgment. M & A did not show that it gave "valid consideration" for its original or modified Second DOT. M & A "was unclear as to how much money it [was] owed, produced no meaningful accounting records, [did] not offer[] any accounting records for [its loans]; and, apparently, . . . maintained no records concerning the collection of rents and the cost associated with maintaining the property."

13

## III.  DISCUSSION

M & A does not claim that its modified Second DOT, securing $410,000, should be deemed senior to SMN's and Tran's Third and Fourth DOTs.  Rather, M & A claims, as it did in its cross-complaint and at trial, that its original Second DOT, securing $160,000 of M.A.'s over $2 million in loans to N.A., together with the over $825,000 that M & A paid to pay off the First DOT, should be deemed senior to SMN's Third DOT and Tran's Fourth DOT.  For reasons we explain, we disagree.

### A.  *Standard of Review*

In reviewing a judgment based on a statement of decision following a bench trial, we resolve any conflicts in the evidence in favor of the trial court's express and implied factual findings.  (*Gevorgian*, *supra*, 218 Cal.App.4th at p. 613.)  Questions of law are reviewed de novo.  (*Cuillette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 765.)  This case, however, involves mixed questions of law and fact.

" 'Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied.' " (*General Mills*, *Inc. v. Franchise Tax Bd.* (2012) 208 Cal.App.4th 1290, 1302.)  "Our standard of review on a mixed question of fact and law depends on the type of inquiry involved.  'If the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test.  If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its

14

determination is reviewed independently.' " (*Id*. at pp. 1302-1303, quoting *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888.)

Here, whether M & A's original Second DOT securing the $160,000 sum, and the over $825,000 that M & A paid FCI to pay off the First DOT, should be senior to SMN's and Tran's Third and Fourth DOTs, presents mixed questions of law and fact. We agree with the trial court's conclusion that SMN's and Tran's DOTs must be senior to M & A's *unmodified* Second DOT, securing the $160,000 sum, together with the monies that M & A paid FCI to satisfy the First DOT and any overdue taxes that M & A paid on the Ontario property—even though M & A's unmodified Second DOT was recorded before SMN's and Tran's DOTs.

B. *Applicable Legal Principles*

We begin with the principles articulated in *Gevorgian* and *Gluskin*, the cases the trial court relied on in ruling that SMN's and Tran's Third and Fourth DOTs were senior to M & A's second DOT and the monies M & A paid FCI to pay off the First DOT. The trial court interpreted *Gevorgian* and *Gluskin* as standing for the following proposition: "Any modification to a senior mortgage that shortens the maturity date of the loan or increases the debt is considered a material modification, such that the senior mortgage will lose its priority to the junior mortgage." As we explain, this proposition overstates the rule articulated in *Gevorgian* and *Gluskin*.

Moreover, in some circumstances, equity requires only that *the modified portion* of a senior lien, and not the unmodified portion, will lose priority to junior liens. (*Lennar Northeast Partners v. Buice* (1996) 49 Cal.App.4th 1576, 1587-1588 (*Lennar*).) Here,

15

however, we agree with the trial court's ultimate conclusion that M & A's entire Second DOT, including its unmodified portion securing the $160,000 sum, must lose its priority to SMN's and Tran's Third and Fourth DOTs—even though the unmodified Second DOT securing the $160,000 sum was recorded before SMN's Third DOT and Tran's Fourth DOT.

1. *Gevorgian* and *Gluskin*

*Gevorgian* involved competing claims of lien priority between (1) the seller of real property, which took back a deed of trust in selling the property to a developer, and (2) the bank that agreed to finance the development of the property through a construction loan. (*Gevorgian*, *supra*, 218 Cal.App.4th at pp. 605-606.) Pursuant to a subordination agreement, the seller agreed to subordinate its purchase money deed of trust to the bank's deed of trust securing the construction loan—a common practice when a property is to be developed with a construction loan and is encumbered by a prior, purchase money deed of trust. (*Id.* at pp. 607-608, 614; see Civ. Code, § 2898 [A purchase money deed of trust has priority over other liens on the property, subject to the operation of the recording laws.].) Unbeknownst to the seller, the bank and the developer entered into a "side agreement" or letter of understanding (the LOU), which was materially inconsistent with the terms of the construction loan agreement (the CLA) and increased the risk that the developer would default in paying the seller's subordinated purchase money loan. (*Gevorgian*, *supra*, 218 Cal.App.4th at pp. 607-608, 611.)

The CLA placed 21 conditions precedent to each advance of loan funds to the developer, based on the developer's submission to the bank of plans, specifications,

16

permits, and other requisite approvals for the project. (*Gevorgian*, *supra*, 218 Cal.App.4th at p. 608.) The LOU, in contrast, provided for an immediate disbursement of $2.2 million to the developer, which could be used to pay "existing liens" on the property. (*Id*. at pp. 608, 611, 620.) Most significantly, the LOU "signified" that the developer lacked sufficient capital to develop the property, apart from the construction loan, and contrary to the seller's understanding. (*Id*. at pp. 611, 620-621.) The seller understood that the developer had been funded with $4.4 million in capital contributions from its principals, and that none of the construction loan funds would be used to pay any part of the purchase price or other "existing liens" on the property. (*Id*. at pp. 620-621.) But based on the LOU, "the deal was changed" so that none of the developer's principals contributed significant capital to the project; two of the principals financed the purchase of part of the property with loans paid off with the construction loan; and the third principal contributed no capital. (*Id*. at p. 620.) Thus, the LOU increased the risk that the developer would not complete the project and, accordingly, increased the risk that the developer would default in paying the seller's loan. (*Id*. at pp. 620-621.)

*Gevorgian* concluded that substantial evidence supported the trial court's finding that the LOU made material modifications to the CLA, without the knowledge of the seller, and that these modifications materially impaired the seller's security. (*Gevorgian*, *supra*, 218 Cal.App.4th at p. 618.) As a result, the bank's deed of trust lost its priority over the seller's subordinated deed of trust. (*Ibid*.) In reaching this conclusion,

17

*Gevorgian* relied on principles articulated in several cases, including *Gluskin*, *supra*, 32 Cal.App.3d 307. (*Gevorgian*, at pp. 614-617.)

*Gluskin* involved a property seller who subordinated its deed of trust to two deeds of trust in favor of a construction loan lender and expressly waived its right to require the lender to supervise or control the buyer's use of the construction loan funds. (*Gluskin*, *supra*, 32 Cal.App.3d at pp. 311-314.) The seller claimed that its subordinated lien was senior to the lender's liens because the lender and buyer modified the terms of the construction loans and, in doing so, materially undermined the value of the seller's subordinated lien. (*Id*. at pp. 311-312.) The buyer defaulted on the construction loans, and the lender purchased the property at a foreclosure sale. (*Id*. at p. 312.)

The trial court in *Gluskin* entered judgment in favor of the lender, and *Gluskin* reversed. (*Gluskin*, *supra*, 32 Cal.App.3d at pp. 309, 318.) Although *Gluskin* recognized that a lender has no general obligation to protect a subordinating seller from the risk of the buyer's default, the court pointed out: "[T]his is not to say that a lender and a buyer can enter into an agreement or a course of conduct between themselves whose result is to destroy a seller's interest." (*Id*. at p. 315.) Absent the seller's consent to the agreement or course of conduct between the lender and the buyer, public policy principles protect the seller from such agreements or conduct that materially affects the value of the seller's lien. (*Id.* at pp. 314-315.) That is, "a lender and a borrower may not bilaterally make a material modification in the loan to which the seller has subordinated, without the knowledge and consent of the seller to that modification, if the modification materially affects the seller's rights." (*Id*. at p. 314.)

*Gluskin* elaborated: "The absence of malevolent purpose does not itself immunize the buyer and the lender. If, however innocently, their bilateral agreement or conduct *so modifies the terms of the senior loan that the risk that it will become a subject of default is materially increased*, then the buyer and the lender may subject themselves to liability to the seller if they proceed without the latter's consent, and if the seller's otherwise junior loan is to be adversely affected." (*Gluskin*, *supra*, 32 Cal.App.3d at p. 315, italics added.) "If dispute results from an unconsented to modification it is of course a question of fact whether the modification materially affected the rights of the subordinated seller." (*Ibid.*)

Unlike *Gevorgian* and *Gluskin*, this case does not involve a property seller who took back a purchase money deed of trust from a buyer, and who agreed to subordinate its purchase money deed of trust to a construction lender's deed of trust. Moreover, neither *Gevorgian* nor *Gluskin* stands for the general proposition, articulated by the trial court in its statement of decision, that "[a]ny modification to a senior mortgage that shortens the maturity date of the loan or increases the debt is considered a material modification, such that the [entire] senior mortgage will lose its priority to the junior mortgage." *Lennar* is more closely on point and illustrates that, when the modification to a senior lien does not affect the value of the underlying security, the equities require *only* that the *modified portion* of the senior lien lose its priority.

2. *Lennar*

*Lennar* involved competing claims of lien priority between two "hard money lenders." (*Lennar*, *supra*, 49 Cal.App.4th at pp. 1587-1588.) The principal issue in

19

*Lennar* was whether material modifications to a senior lien, which significantly increased the amount of the secured debt and the interest rate on the debt, meant that the *entire* senior lien had to be equitably subordinated to a junior lien. (*Lennar*, *supra*, 49 Cal.App.4th at pp. 1584-1585.) The trial court in *Lennar* relied on *Gluskin* in ruling that the modifications to the senior lien resulted in the loss of priority of *the entire* senior lien to the junior lien. (*Id*. at p. 1585.) But as the *Lennar* court pointed out, "the *Gluskin* court did not specify the liability the buyer and the lender face in making a modification without consent of the subordinating seller, [although] the case has been interpreted to permit the loss of the lender's [entire] lien priority." (*Id*. at pp. 1586-1587.)

The *Lennar* court ultimately concluded that the equities in the case before it did not require the loss of priority of the entire senior lien; rather, the impairment of the junior lienholder's rights could be "fully eliminated" by denying priority only to the modified portion of the senior lien. (*Lennar*, *supra*, 49 Cal.App.4th at p. 1588.) *Lennar* noted that, in contrast to *Gluskin*, the modification to the senior lien "had no effect on the value of the underlying security." (*Lennar*, *supra*, 49 Cal.App.4th at p. 1588.)

*Lennar* distinguished cases involving a subordinating seller, including *Gluskin*: "When the junior lienholder is a subordinating seller, equity may require a different result. As the *Gluskin* court noted, a subordinating seller is in a particularly vulnerable position. By subordinating the purchase money deed of trust to that of the construction lender, the seller must rely that proceeds from the construction loan will properly be used to enhance the value of the property, for only then can the seller be assured the property will be adequate security for the purchase loan and the construction loan." (*Lennar*,

20

*supra*, 49 Cal.App.4th at 1588.)  In addition, the subordinating seller in *Gluskin* was left with "worthless security," following the material modifications to the construction loans. (*Lennar*, at pp. 1588-1589.)  Thus, in *Gluskin*, "subordinating the entire lien of the construction lender to those of the existing juniors [was] fair and reasonable." (*Lennar*, at p. 1589.)

*Lennar* quoted from a New York case, which articulated "[t]he rationale for deciding when to subordinate only the modification and when the entire lien loses [its] priority":  " ' It is well established that while a senior mortgagee can enter into an agreement with the mortgagor modifying the terms of the underlying note or mortgage without first having to notify any junior lienors or to obtain their consent, if the modification is such that it prejudices the rights of the junior lienors or impairs the security, their consent is required [citations].  Failure to obtain the consent in these cases results in the modification being ineffective as to the junior lienors [citation] and the senior lienor relinquishing to the junior lienors its priority with respect to the modified terms [citations].  While this sanction ordinarily creates only the partial loss of priority noted above, in situations where the senior lienor's actions in modifying the note or mortgage have substantially impaired the junior lienors' security interest or effectively destroyed their equity, courts have indicated an inclination to wholly divest the senior lien of its priority and to elevate the junior liens to a position of superiority [citation].' " (*Lennar*, *supra*, 49 Cal.App.4th at p. 1589, quoting *Shultis v. Woodstock Land Dev. Assoc.* (1993) 188 A.D. 2d 234, 236-237.)

C. *Analysis*

With these governing legal principles in mind, we turn to M & A's claim that only the modified portion of its Second DOT—the portion securing the additional $250,000 sum, but not the original Second DOT securing the original $160,000 sum—should have been subordinated to SMN's and Tran's DOTs. We conclude M & A's modified Second DOT, securing the $160,000 sum, was properly subordinated to SMN's and Tran's DOTs, along with the over $825,000 that M & A paid to satisfy FCI's First DOT, and any overdue taxes that M & A paid on the Ontario property.[5]

Our conclusion is based on the trial court's factual findings concerning the origins of the $160,000 debt secured by the original Second DOT, and the substantial evidence supporting these findings. Most significantly, the court found that M & A failed to show that it had a "valid lien" on the Ontario property. As the court pointed out, M & A was "unclear as to how much money it was owed, produced no meaningful accounting records, has not offered any accounting records for the amounts it lent to the borrower; and, apparently, has maintained no records concerning the collection of rents and the cost associated with maintaining the property."

---

[5] Civil Code section 2876 provides: Where the holder of a junior deed of trust is compelled to satisfy a prior deed of trust to protect the junior deed of trust, the amount so paid becomes part of the indebtedness secured by the junior deed of trust. (Civ. Code, § 2876; *United Sav. & Loan Assn. v. Hoffman* (1973) 30 Cal.App.3d 306, 313.) The statute allows a junior lienholder, who is compelled to satisfy a prior lien in order to protect the junior lien, to add the amount so paid to the amount secured by the junior lien and "to enforce both together." (*Windt v. Covert* (1907) 152 Cal. 350, 352-353.) The statute also allows a mortgagee or a beneficiary under a deed of trust to pay taxes due on a property, if the mortgagor or trustor has failed to pay them, and to add the taxes paid to the secured debt. (*Security-First Nat'l Bank v. Lamb* (1931) 212 Cal. 64, 68-69.)

To be sure, on September 1, 2015, Neram's principal, N.A., confirmed in writing to M.A. that he, N.A., owed M.A. $2,092,500, and M.A. testified that M & A was given the original Second DOT, securing the $160,000 sum, to secure part of the $2,902,500 debt.

But M.A. did not know how much of the $2,092,500 debt had been repaid to him, or to M & A, at the time of trial. M.A. also testified that he was given other deeds of trust on other properties to secure other portions of the $2,092,500 sum, that N.A. paid "several of the smaller" secured portions of the $2,092,500 sum, and that M.A. foreclosed on and later sold some of the other properties. But M & A offered no accounting of the $2,092,500 debt, including how much of it had been repaid to M.A. or to M & A. M & A also offered no accounting of the rents it received from the Ontario property. As the court noted, any rents M & A received from the Ontario property were required to be credited against M & A's Second DOT. (See *Strutt v. Ontario Sav. & Loan Assn.*, *supra*, 28 Cal.App.3d at p. 880.)

The court found it "appear[ed]" that M & A had received its "lien amount," through its collection of rents on the Ontario property. Substantial evidence shows that M & A received at least the $160,000 sum through its rent collections. M.A. testified that, between June 2017 and November 1, 2019, a period of around 29 months, M & A received $8,000 to $9,000 a month in rents from the Ontario property.[6] If M & A received $8,000 in rents for 29 months, then M & A received $232,000 in rents from the

---

[6] The court's statement of decision erroneously states that M & A received $8,000 *to $12,000* a month in rents.

23

Ontario property ($8,000 x 29 = $232,000).  And, although M.A. testified that M & A

paid *all* of the expenses associated with the Ontario property, including overdue taxes,

M & A offered no accounting of the expenses it paid or the *net* rental income it received,

on the Ontario property.

In other circumstances, we might agree with M & A that only the modified portion

of its Second DOT, securing the $250,000 sum, should be subordinated to SMN's and

Tran's later-recorded DOTs.  (Cf. *Lennar*, *supra*, 49 Cal.App.4th at p. 1588.)  There is no

evidence that M & A's original Second DOT did anything that adversely affected the

value of the Ontario property or the value of SMN's and Tran's DOTs.  (*Ibid*.)  In

addition, SMN and Tran had constructive notice of M & A's original Second DOT,

securing the $160,000 sum, because the original Second DOT was recorded before

SMN's and Tran's DOTs were recorded.  (See *Thaler v. Household Finance Corp.*

(2000) 80 Cal.App.4th 1093, 1099.)  Tran admitted that she knew about the First, the

original Second, and the Third DOTs when she loaned Neram the $200,000 pursuant to

the Fourth DOT.  The trial court's reliance on *Gevorgian* and *Gluskin* was also

misplaced.  (See *Lennar*, at pp. 1588-1589.)

But as we have explained, the court found, and substantial evidence shows, that

M & A failed to show that its original Second DOT secured a "valid lien" on the property

for $160,000.  This was a failure of proof on M & A's part.  It means that M & A did not

prove that it had a valid DOT, securing the $160,000 sum, to place senior to SMN's and Tran's DOTs.[7]

## IV.  DISPOSITION

The judgment is affirmed.  SMN and Tran shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
_____
J.

We concur:


RAMIREZ
_____
P. J.


MENETREZ
_____
J.

---

[7] We observe that the judgment placing SMN's and Tran's DOTs senior to M & A's Second DOT, as originally recorded and as modified, does not necessarily leave M & A without recourse against the Ontario property for the recovery of the amounts secured by its original or its modified Second DOT, the over $825,000 that M & A paid to satisfy the First DOT, and for any overdue taxes that M & A paid on the Ontario property.  The judgment only means that M & A may collect these sums only to the extent that the value of the Ontario property exceeds the amounts due under SMN's and Tran's DOTs.